MAMIE CHRISMER et al., by Next Friend, v. BELL TELEPHONE COMPANY, Appellant.

In Banc, February 26, 1906.

1. **NEGLIGENT PLAN: Elimination of Elements: Instruction.** Where plaintiff in a negligence case complains of the elements of the plan of work adopted by defendant, as well as the plan itself, defendant is entitled to instructions which eliminate from consideration by the jury one by one the elements which were supported by no substantial evidence.

2. ———: ———: ———: **Boat: Oarlock.** Where plaintiff admitted that the boat used by defendant in transporting its workmen from the shore to a barge stationed amid stream was

suitable for that use in every respect except the oarlocks and the method of fastening the oars therein, and the evidence shows that the master was not negligent in that particular, but employed the oarlocks and the method of fastening them in ordinary use in the business, the court should sustain an instruction to the effect that there was no evidence that the boat was not reasonably safe, and also that there was no evidence that the oarlocks and the method of fastening them to the gunwale was not reasonably safe.

3. ———: **Master and Servant.** The master does not insure against danger, but against negligence.

4. ———: ———: **Tools: Care: New Invention.** The master is bound to use ordinary care to supply reasonably safe tools and appliances to his servants. But this does not mean that he is to conform to every new invention, nor use the best tools or appliances obtainable. The test of negligence is the ordinary use of the business. The standard of ordinary care is the conduct of ordinarily prudent persons under like circumstances.

5. ———: ———: ———: **Unsafety in a Single Instance: Oarlocks.** The master is not required to select tools for general use with reference to one possible incident, nor can due care be settled by a single incident. The fact that oarlocks of a boat when in position were tight, does not determine that their use was negligence, simply because, under the particular circumstances of the accident, a "U" or "peg" lock might have availed to avoid it.

6. ———: ———: **Unskilled Workmen.** In transporting its men from the shore to a barge anchored in the river where they had been at work for several days, defendant hired an experienced and admittedly competent oarsman and his boat. Five men were transported at a trip, and at such times this oarsman was assisted, by assignment of the foreman, by two other workmen who were also admitted to be competent oarsmen. From the barge to the shore was a wire which sagged down into the deep and swift turbid water, and when the boat crossed this close to where the wire reached the water, if the oars which were fastened to the gunwale by tight locks, were dipped too deep, the boat might swing around and upset. The men were told to start early to their work, and five of them reached the shore about six o'clock, and without waiting for the foreman to arrive they started to the barge, the owner of the boat at the front oars, and an inexperienced oarsman named Byrnes, employed at the construction work on the barge, at the other oars. Just after the boat started one of said workmen, an experienced and assigned oarsmen, called to the men to return

and take him, but Byrnes, who had rowed once or twice before, told him he was too late, and deceased made no request that they take him on, neither did he object to Byrnes rowing. As the boat came down across the wire, Byrnes dipped his oars too deep, they caught on the wire, the boat capsized, and the father of plaintiffs was drowned. *Held*, that defendant was not responsible for Byrnes acting as oarsman, and was not negligent in employing unskilled and incompetent men to row the boat, and the court should have so instructed. *Held*, also, that plaintiffs cannot recover.

7. ———: ———: ———: **Master's Diligence.** The master is not required to be present at every precise instant to anticipate and guard against the whimsical negligence of those of his servants who are fellow-servants to each other.

8. ———: ———: **Assumption of Risk.** Defendant's workmen including deceased were engaged in repairing a submerged cable across the Missouri river. A barge was anchored in the river by a wire attached to a stake on the shore, and was moved shoreward as the repair work went on, and this wire, attached also to the barge, was used also to bring material from land by means of a pulley, but when not in use for that purpose was permitted to sag in the water. The cable passed over the barge, and both it and the wire sagged down into the water twenty or thirty feet from the barge and those parts in the water could not be seen. The skiff or boat used in reaching the barge passed up the river near the shore, then pushed out into the swift current, came down across the wire and cable, and as it did so the oars of an inexperienced oarsman, who had assumed to row, with no prior instructions to do so and without objection from deceased, who was in the boat and a fellow-servant, dipped his oars too deep, they caught the wire and the boat was capsized. *Held*, that defendant was not negligent in permitting the wire and cable to sag down into the water, and that the danger was as obvious to deceased as to others, and was incident to the business, and he assumed the risk.

Per Valliant, J., dissenting, with whom Gantt and Burgess, JJ., concur.

1. **NEGLIGENCE: Master and Servant: Master's Duty to Know.** Before sending his servants into a field where danger is to be reasonably expected, it is the master's duty to know what the danger is, and to know what precautions are reasonably necessary to take to avoid it. He cannot hide his liability behind ignorance of the situation. And this duty is continuous and unending while the service continues.

2. ———: ———: ———: **Vice-Principal: Presence at Danger: Boat.** Where the master hired an oarsman and his boat to transport workmen to a barge anchored in the river where they worked, and thereafter entrusted its entire management to him, the boat became the master's boat, and the oarsman his vice-principal. In contemplation of law the master is or should have been, in person or by representative, ever present, observing and directing the operation of the work; and if he hired the oarsman and the boat to transport the men, and gave him no orders, and that oarsman permitted an incompetent fellow-servant of deceased to assist him in rowing the boat, that oarsman, and consequently his master, was to blame if, by the awkward rowing of the inexperienced oarsman, the boat was capsized and a workman being transported was drowned.

3. ———: ———: **Independent Contractor.** If the owner of the boat employed to transport the defendant's workmen from the shore across the swift current of the river to the barge was an independent contractor, then defendant was bound to use care to employ a competent man in that line of work. But where the boatman was only about twenty years of age, had followed the business of making cob pipes for a living, and was not in the ferry business, and was not known as or professed to be a contractor in river transportation of any kind, he was not, when he and his boat were employed to transport the men under terms indicative of no intention to constitute him such, an independent contractor.

4. ———: ———: ———: **Boatman: No Orders.** The fact that defendant's foreman, in and after employing the oarsman and his skiff to transport the workmen, gave him no orders, indicates that the foreman was neglectful of duty, and not that the oarsman was an independent contractor.

5. ———: ———: **Boatman: No Orders: Right of Fellow-Servant.** Where defendant's foreman employed the boatman and put him in charge of the whole work of transporting the men, without instructions, a workman of defendant, being transported by the boatman, is not to blame if he put the same trust and confidence in him that the foreman did. And if that boatman permitted an incompetent oarsman to handle one set of the oars, and his awkward stroke caused it to upset at a point where the foreman knew, and all persons of ordinary prudence might expect, an accident would follow, the negligence in the boatman's allowing the awkward and inexperienced oarsman to take the oars was imputable to defendant.

6. ———: ———: ———: ———: **Care in Selection: Tools: Question for Jury.** Whether or not the man selected by defendant's foreman to act as boatman in transporting defend-

ant's workmen to the barge, possessed the proper skill and judgment to be entrusted with the lives of those men, was, under the circumstances of this case, a question for the jury; and so, also, whether or not the skiff selected for that purpose was a reasonably safe boat, was a question for the jury.

Appeal from Franklin Circuit Court.—*Hon. John W. McElhinney,* Judge.

REVERSED.

*Seddon & Holland* for appellant.

The court erred in refusing to give the peremptory instruction offered by the defendant at the close of all the evidence. There were five distinct allegations of negligence made by plaintiffs in their petition, but there was no evidence to sustain any of them. Minnier v. Railroad, 167 Mo. 99; Hogan v. Railroad, 150 Mo. 36; Berring v. Medart, 56 Mo. App. 443; Smith v. Railroad, 69 Mo. 32.

*Chas E. Peers, Jesse H. Schaper* and *John W. Booth* for respondents.

(1) It is the duty of the master to furnish to the servant a reasonably safe place and reasonably safe machinery and appliances in which and with which to do the master's work. Holmes v. Brandenbaugh, 172 Mo. 64; Curtis v. McNair, 173 Mo. 283; Gardner v. Railroad, 135 Mo. 90. "It is true that the master is not bound to adopt any particular kind of machinery, but he is bound to procure that which is reasonably safe for the work designed, whatever kind he adopts." Bender v. Railroad, 137 Mo. 250; Gibson v. Railroad, 46 Mo. 163; Henry v. Railroad, 109 Mo. 493; Nicholds v. Crystal Glass Co., 126 Mo. 55. (2) The servant never assumes the risk of the master's negligence. Curtis v. McNair, 173 Mo. 280. (3) It is the duty of the master

to exercise reasonable care commensurate with the nature of the business, to protect his servant from the hazards incident to it. Curtis v. McNair, 173 Mo. 280; Williams v. Railroad, 119 Mo. 316; Rodney v. Railroad, 127 Mo. 676; Herdler v. Buck's S. and R. Co., 136 Mo. 3; Fogarty v. Transfer Co., 180 Mo. 506. (4) The master is an insurer of the servant's safety against the negligence of the master himself (Zellar v. Missouri W. & L. Co., 92 Mo. App. 124), and it is contrary to public policy to allow the master to relieve himself even by contract from his own negligence. Curtis v. McNair, 173 Mo. 280. (5) Knowledge of agents instructed with the performance of the duties of the master is the master's knowledge, and negligence of such an agent is negligence of the master. Fogarty v. Transfer Co., 180 Mo. 503. (6) The accident which resulted in the death here sued for was caused by a skiff being overturned in the Missouri river, while being used by appellant engaged in transporting its servants from the south bank of the river to appellant's barge stationed in the river for the purpose of there performing work for appellant. The work had been going on for five days and such transportation had been going on daily many times a day during the whole five days along a course extending northwardly from the shore to the barge a distance from 250 to 275 feet, and in that general course varying from a single and fixed track, as was inevitable in the rowing of a skiff across swiftly moving water. Along this course appellant at the beginning of the work stretched a strong wire above the water. Two days before the overturning of the skiff, appellant slacked the wire so that it sagged into the water and for the greater part of its length lay underneath the water where it could not be seen. In the water it was strongly deflected to the east by the strength of the current and constituted an evidently dangerous obstruction to the navigation of the river in the skiff along said course of navigation. The accident was caused by an oar of the skiff coming

in contact with that obstruction at a place where it was concealed from view by three feet of the muddy water of the river. Chrismer, servant of the appellant, whose death is sued for, was in the discharge of his duty as such servant in the skiff on his way to the barge. The skiff was overturned without his fault and he was thereby drowned. The case, therefore, in so far as it relates to the negligence of the master in making and maintaining the obstruction at the place, and under the circumstances, and in the manner in which it was maintained, involves merely an application of the law declared in the case of Murphy v. Railroad, 115 Mo. 111. In that case the court held as follows, to-wit: (a) "A railroad company is in duty bound to place its signal posts, telegraph poles, cattle-guard fences and other structures used in connection with the road, at a reasonably safe distance from the track, to the end that they will not be dangerous to those engaged in operating its trains." (b) "It is not sufficient that such structures should answer the purpose for which erected. In building them the safety of the servants in operating the trains must be considered." (c) "If it becomes necessary to place such structures so near to the track as to be dangerous to such operatives, then it is the duty of the company to warn them of the danger so that they can govern their conduct accordingly." (d) "When it is found that the company has itself placed such a structure so near the track as to be dangerous to its servants in the discharge of duties assigned to them, and an injury has occurred from that cause without fault on the part of the servant injured, the liability of the company is fixed. Additional proof is not necessary in such a case." Murphy v. Railroad, 115 Mo. 118. (7) Having provided for the performance of its work on the barge in the river a skiff and oars for the transportation of its workmen to and from the barge in the discharge of their duties as appellant's servants, it was the duty of appellant to provide and furnish a sufficient

force of competent oarsmen to properly row and manage the skiff in such transportation. This is merely one application of the law which makes it the duty of the master generally to provide a sufficient and competent force of workmen for the performance of his business. Coontz v. Railroad, 121 Mo. 659. It is unquestionably the law that a master must furnish a sufficient number of men to do his work with reasonable safety to his employed servants. Stoddard v. Railroad, 65 Mo. 514; McMullen v. Railroad, 60 Mo. App. 236. (8) The mere knowledge of Chrismer, at and before the time he was drowned, of the existence of the submerged cable, and of the place next the barge where it emerged from the water, and that he, working under the immediate orders and supervision of appellant's foreman assisted in placing the wire strand in position, does not interpose any obstacle to the maintainance of this action. Scott v. Springfield, 81 Mo. App. 321; Sullivan v. Railroad, 107 Mo. 78.

LAMM, J.—This action was brought by the three minor children of Edward L. Chrismer, for the death of said Edward by the alleged negligence of defendant corporation. The trial resulted in a judgment in their favor for $3,200, signed by ten out of twelve jurors, and defendant appealed to this court on assignments of error, one of which challenges the constitutionality of the law permitting less than twelve jurors to render a verdict. As such constitutional question, since Gabbert v. Railroad, 171 Mo. 84, decided December 24th, 1902, is no longer considered an open one, it is not deserving of, and therefore will not receive attention; but as the appeal in this case was taken prior to the date the opinion in the Gabbert case was handed down, the cause will be considered on its merits.

Attending to the case made on the facts, it is as follows:

Edward L. Chrismer was the rise of thirty-five

years of age and was an employee of appellant corporation from March 18th, 1901, to July 13th of the same year. Prior to his taking service with appellant, he was a lineman and had worked for railroad companies and in "building artesian wells" but was a novice as a river waterman. After becoming appellant's servant, he worked in a construction gang and part of the time on cable work, so that, on July 13th, 1901, it befell that he was one of a construction and repair gang of twelve men engaged on the repair of appellant's submarine cable crossing the Missouri river from Washington in Franklin county to the north shore of said river in Warren county. This gang was under Thompson, a general foreman, and Caesar, a subforeman. It seems that appellant's cable was connected with the aerial wires and poles on either shore, and consisted of a bundle of wires compressed in a jacket or otherwise held together in a cable form two inches thick. As it lay on the river bed, it got out of repair and about five days prior to the date in question, said construction and repair gang came from St. Louis to raise and repair the cable.

The plan and *modus operandi* adopted for the work were as follows: a water craft was chartered. This craft, called a flat boat or barge, was a craft with rake ends, standing, as ladened at the times in hand, about three feet from the gunwale to the water line, was about 35 or 40 feet long by 15 feet wide, and was such a craft as was generally used for carrying material, freight, ferrying, etc., on river waters. It was equipped with pulleys and certain mechanical appliances, among others, those appurtenant to bringing material from the shore on a steel wire.

As the said cable is distinguished in the evidence from said steel wire, the latter being called a "strand," and as the witnesses do not always discriminate in their testimony between the cable and the strand, hereinafter, to aid in clearness of statement, said cable will be re-

ferred to as the "cable" and "strand" will be used to designate the steel wire aforesaid, which wire was five-sixteenths of an inch in diameter and extended from the barge as it lay in the river to the south or Washington shore where it was fastened to a stake close to where the cable emerged from the water.

The Missouri river at this point was about one-half a mile wide, and runs from the west to the east. Its current lay toward the south shore and ran swiftly at from 6 to 10 miles per hour, because of being deflected by a bar or reef and a point of rocks near by, and it was further accelerated at the north and south rake ends of the barge as it lay anchored broadside to the current, as will be presently shown, and the muddy waters concealed from the eye objects lying beneath their surface.

This barge, floated a distance amid stream, was located broadside to the current, and the cable was hoisted from the river bed and, being elevated over, rested upon the barge, which thereby and afterwards performed the several offices of a platform for the men to stand and work on, a workshop, and a place to hold the cable in view and in place for repair. As the work progressed, the barge was from time to time worked or moved from the north towards the south, the cable still lying thereon, and the defects thus exposed to view were repaired. The repairs consisted in cutting out defective portions of the cable and splicing in new pieces and in encasing certain portions of the cable with iron pipe. In addition to said strand, extending from the barge to the south shore and there fastened to a stake, certain wires were stretched from the barge up stream to a dock and the primary office of these latter wires was to hold the barge in place against the current. When necessary to move the barge towards the south shore, as we understand the record, the said strand was called in play and manipulated by appliances operated in connection therewith, and which strand, as said, was otherwise used in transporting material from the

shore. When so used in either capacity, it was elevated over the surface of the water, held taut and the material brought to the barge from the shore by means of a rope and pulley on the strand, or the barge was moved toward the shore in line with the cable, as the case might be. When not in use, the strand was permitted to slacken into the water, and when so slack it entered the water about fifteen feet from the barge and reappeared a short distance from the south shore, and the evidence shows that continuously for two days before the 13th of July the strand lay slack in the water, subject may be to some deflection by force of the current. The cable, elevated on the barge, returned to and disappeared in the water about the same distance from the barge as did the strand. The portions of the cable and strand elevated over the barge were in plain view from the south shore and they could be seen from the points where they left the barge to the points where they entered the water, but the roiled condition of the water, as said, concealed both cable and strand at once upon their striking its surface.

The work had progressed for five days or so and the barge had been moved south from time to time until it was within 150 feet or thereabouts of the south shore and there it remained in position over the night of July 12th. The construction gang lodged and ate in the town of Washington, and the plan adopted for getting the men to and from their work was this: a skiff was hired from one Hugo Lambke and with it he was hired as an oarsman. He and his boat were paid for at $2 per day. Lambke was within a month or so of twenty years of age. His regular employment was a cob-pipe maker in a cob-pipe factory in Washington, but he was a waterman, had been for years skilled in the use of oars and in rowing skiffs on the Missouri river, in fishing, in catching drift and ferrying people (principally his own kin) over the river and rowing them to and fro thereon. While some comment is made by respondents' coun-

sel on his age, yet the case is presented to us substantially on the theory that he was an adept and, hence, a competent riverman. His skiff was 15 feet 10 inches long, 16 inches deep, 4 feet 4 inches wide at the top and 2 feet 5 inches wide at the bottom, and was such a skiff as was usually employed in navigating the Missouri river and other like waters. It was equipped with two pairs of oars, and these oars were "tight oars," otherwise known as swivel oars; that is to say, the oarlock was so arranged that when the oar was in position it was tight, the oarlock being fastened to the oar by an iron pin about the size of an eight-penny nail transversing it and the lips of the oarlock. The oarlock had a circular iron pin as thick as one's finger and about two or three inches long, dropping therefrom, and which pin fitted into a hole or socket in the gunwale and revolved there as a pivot with each oar stroke. While this was the usual oar and oarlock used on boats of this character in navigating this stream and like waters, yet there was evidence that a different sort of oarlock was sometimes, but rarely, used. For instance, a cut was made in the gunwale of a boat in the form of the letter "U" and the oar was loosely placed in this cut. Another device was to insert pegs in the upper edge or gunwale of the boat and the oar would be placed in and worked between these pegs, but neither of the latter appliances was shown to be in usual use. In fact, of all the boats known to the witnesses and used on these or similar waters, there was but one that was shown to be equipped with any oarlock appliances or oars differing from those used on Lambke's boat, and that was a light pleasure boat known as a clinker-built boat, i. e., a lapstreak boat, so designated because of the exterior boards overlapping like the weather-boarding on a house. Sundry dangers were indicated by the evidence pertinent to the use of tight oars or swivel oarlocks. For instance, in the turbid Missouri river water, where submerged snags and other obstructions abound and are not discoverable,

to dip a tight oar too deeply in a swift current might cause the blade of the oar to catch on a sunken obstruction, whereat the pressure of the current might lock the oar in position and tighten it so that the oarlock pin could not be, in such emergency, pulled out of its socket in the gunwale and this might either result in breaking the oar or overturning the boat; whereas it was shown that the loose oar on meeting such obstruction would automatically adjust itself to the circumstances, or could be unshipped by a twist of the wrist.

In this connection the following occurred at the trial, referring to Lambke's skiff: (by appellant's counsel): "Will counsel admit that this was a suitable boat and suitable appliances for crossing this river at this point?" (By Judge Booth, one or respondents' counsel): "It would be if those obstructions were not there." (By Mr. Holland): "Apart from obstructions and dangers you admit that this was a proper boat to cross this river at that place?" (By Judge Booth): "Except for these appliances and obstructions, yes." From which it would appear that, the oarlocks and the method of fastening the oars therein and to the boat excepted, it was admitted that Lambke's boat was a suitable craft for transporting the men to and fro.

Lambke's duty was to row the men back and forth from the south shore to their work, and between times to fetch and carry from the town ice and water and buy ice for the men. He generally took the men in two cargoes—once in the morning in two trips, back and forth at noon and back at night, making eight trips with men each day. While he could row his skiff with five or six men across the Missouri river and had done so prior to his employment, yet in the stiff current it was best to have an additional rower, and accordingly two of the construction gang, confessedly experienced oarsmen, Johnson and Haines, were assigned by appellant's foreman to assist him, and Caesar and Thompson also assisted somewhat once in a while. In this construction

gang was one Byrnes.    The evidence showed that while Lambke considered him a fair oarsman, yet that in fact and in truth he was unskilled and unfit for that work and had a knack of using his oars too deeply in the water as if, to use the chimney-corner expression of one witness, he was "digging    potatoes." The only instructions given to the oarsman, including Lambke, were to land on the down-stream side of the barge at a little distance from its southeast corner.   Here the force of the current was broken by the barge and dead water existed, and it was the safest and the proper place to disembark and embark the men.  The route this skiff took on its trips was left optional with the rowers, that is to say, no directions whatever were given by Thompson or Caesar.    There was evidence, however, that in leaving the south shore advantage could be and was sometimes taken of a little dead water right at the shore to row west up stream and then strike the current and get up away farther and then drift across, aided by the current, slantwise, northeast to the barge-landing, crossing the cable and strand *en route*.   If such crossing were made, say, twenty feet from the barge there was no danger, but if the crossing was closer to the barge than that there was danger of fouling an oar on the strand or cable.    There was other evidence in the case that the usual course of the skiff was to keep east of the cable and strand, *i. e.*, on the down-stream side, the whole way across, and that by heading the boat properly and holding it skillfully with the oars, the force of the current could be used to drift the boat across quite to the barge-landing to the east of the cable and strand. This course would not involve crossing the strand or cable at all; and the record shows the boat had made as many as fifty trips without accident up to the morning of July 13th.

Shortly after six o'clock on the morning of July 13, 1901, before the foremen got to the levee, and at an unusual hour (though there is evidence that the men

were instructed to get an early start that morning), five of the men, inclusive of Lambke, appeared at the levee, when neither Johnson nor Haines was present, and boarded this boat, to-wit, Chrismer, Byrnes, Pollard and Couzzens, for the purpose of going to the barge to their work. Lambke held the bow oars, that is to say, he was next to the bow of the boat, and his back, when seated, was to the bow. The next seat was occupied by Byrnes who took the second pair of oars. One of the men, Chrismer, took the stern seat. Pollard and Couzzens are not located by the testimony. As they were about to get under way and leave shore, Johnson appeared some distance away and demanded to be taken aboard, but Byrnes foolishly called to him that he (Byrnes) would take the oars, or that Johnson could go, or await the next trip, and there is some evidence that Lambke then and there permitted Byrnes to row, or said he might row, thinking him a competent oarsman. As the skiff left shore, the oarsmen rowed up stream getting west of the strand and cable, and, in undertaking to drift across and reach the barge-landing, they came too close to the barge, Byrnes' starboard oar, plying too deep, fouled on the strand or cable three feet under water, the current drove the boat and locked oar against the strand or cable and overturned the boat in drowning water; two of the men, Chrismer and Byrnes, seized the strand when shipwrecked, but were speedily washed off and drowned, the others floated down stream and were picked up alive.

Lambke, having escaped drowning by the skin of his teeth, as it were, refused longer employment with appellant, but his boat was used after the accident to transport the men until the work was completed without further incident.

There was evidence that the construction gang had placed this cable and strand in position and none to the contrary; so, too, that Chrismer took part in it; also indicating that he knew that the strand as well as the

cable were slackened into the water and made no objection thereto, and that he was familiar with the uses to which the strand was put. There was no evidence that he was invited to go or made any objections to going with Lambke and Byrnes as oarsmen, or that he remonstrated when Johnson was refused admission to the boat, nor was there any evidence that appellant through its foremen had any notice of the plan adopted by the men in crossing that morning or participated in any way in the arrangement then spontaneously made by the men. The record furthermore shows that Byrnes had helped row one or more times, but that the foreman did not know he had taken it upon himself to row at such times, and it is shown that neither of the foremen designated him as an oarsman. It was shown, too, that if Byrnes had not used a negligently deep stroke, the cable or strand could have been crossed safely even as close to the barge as the boat had been steered or drifted.

On March 6, 1902, the widow of Chrismer brought suit against appellant, but having been instituted later than by statute permitted, it was dismissed and in lieu thereof and within the year, his minor children brought this action with the result aforesaid.

The cause was tried on a second amended petition and the gist of the complaint, omitting the general allegations by way of inducement and descriptive of the situation, plan of procedure, appliances used, etc., is shown by the following excerpt therefrom:

"That the making and maintaining of said obstruction to navigation in said river by defendant was wrongful, careless and negligent.

"That with the said obstructions in said river, the said skiff, of the dimensions aforesaid, and with oars, pins and sockets, together operable as aforesaid, was unsuitable, defective and dangerous for use as the same was so provided to be used, and actually used by defendant as aforesaid; and that the providing of the same,

and the using of the same as aforesaid was wrongful, careless and negligent.

"That the failure of defendant to provide and furnish a sufficient number of oarsmen competent to safely row and run said skiff, was wrongful, careless and negligent.

"That the conduct of defendant in transporting its said servants in said skiff as aforesaid with one or two oarsmen rowing the same being unskilled and incompetent, was wrongful, careless and negligent.

"That the conduct of defendant in suffering and causing the transportation of said Edward to said barge, to be as aforesaid, with said Lambke and said Byrnes acting as oarsmen of said skiff, to be begun and continued to the overturning of said skiff as aforesaid, was wrongful, careless and negligent.

"That the adoption and execution by the defendant of the plan on and according to which the defendant caused the said work to be done, and its servants to be transported to and from said barge, was wrongful, careless and negligent.

"That by each and every of its said wrongful, careless and negligent acts and proceedings the defendant wrongfully, carelessly, and negligently, during the entire time of the prosecution of said work, put each of its said servants in imminent danger of being drowned in the waters of said river.

"That the said death of said Edward was caused by the wrongful acts, neglects and defaults of defendant, hereinbefore stated and alleged."

It will be seen that the liability of appellant is predicated in the petition, (1) of negligence in making and maintaining an obstruction to navigation; (2) of failure to provide a sufficient number of competent oarsmen, and of the transporting decedent in a skiff with one of two oarsmen incompetent, and of suffering and causing the transportation of Chrismer to be begun and continued under such circumstances; and (3) that the

whole plan of procedure together with the appliances used, the *tout ensemble,* to-wit, the obstructions in the river (the barge, cable and strand), the skiff of the dimensions aforesaid, plying back and forth, the oars, pins and sockets, etc., were dangerous and defective when used together as indicated.

Appellant stood on a general denial, coupled with a plea of contributory negligence, and coupled with a further plea of full knowledge in Chrismer of the plan, procedure and appliances aforesaid, or that by the exercise of ordinary care these things might have been known to him, and that the dangers were open and obvious and that Chrismer knew the qualifications of his co-workers, etc., and assumed the risk incident to the work.

In an elaborate brief, appellant's counsel present a formidable aggregation of assignments of error touching many rulings of the trial judge in giving as well as in refusing instructions, in modifying instructions asked, and in excluding as well as in permitting evidence, none of which need consideration until such time as it is first determined whether or not other existing assignments of error, based upon the refusal of mandatory instructions to find for defendant on the several specifications of negligence pleaded in the petition, and pressed upon us on review, are allowed; for, if there was error in refusing such mandatory instructions, any other errors become of no controlling importance in the case. In other words, if the case was not entitled to go to the jury at all on any of the specifications of negligence, then the *way* it was put to the jury by the court in other instructions, and errors, if any, against appellant relating to the admission or exclusion of testimony, become one and all academic matters and in the air.

I. Appellant prayed the court to give an instruction (No. 9) to the effect that there was no evidence of negligence in connection with the barge used by de-

fendant, which instruction was refused.  We think it should have been given, because respondents complain of an "obstruction to navigation" in the river and of the "plan" adopted.  Now, the barge was an obstruction and it was a principal element in the "plan."  Its use under the evidence was either negligent or not.  As no conceivable and reasonable plan for raising the heavy submarine cable and holding it up for repair, except by some raft or float or other craft of sufficient capacity and buoyancy to hold the men, together with their tools and appliances, is suggested or occurs to us, and as such craft must needs be stayed or anchored to fill its office and thus become some "obstruction to navigation," and as the barge is in nowise assailed by respondents as unsuited to the problem to be solved in repairing the cable, we cannot see why the jury were not told that no negligence could be predicated of its use.  And this is so for other reasons, viz., the chief offender, the one really struck at as an obstruction, is the cable and strand.  Not only so, but there is no proof that the barge itself caused the accident or contributed thereto.  If such barge in a hypothetical case, say, for instance, in the night time, should be anchored out in a navigable stream, with no signal lights displayed, and thereby cause damage to some craft or person lawfully navigating the stream, a different case might arise, but under the facts disclosed in this record, as respondents complain of the elements of the plan as well as of the plan itself, the appellant was entitled to analyze the negligence into its constituent elements, and eliminate those elements one by one from the consideration of the jury if unsupported by evidence.

II. Appellant asked and was refused an instruction (No. 11) to the effect that there was no evidence in the case that the skiff in question was not reasonably safe for the purposes for which it was being used by appellant at the time of the accident.  To the same ultimate effect was a refused instruction (No. 16) relating to the

oarlock. In our opinion the jury should have been given these instructions, and this for the reasons last above and for others to be presently considered. It must not be forgotten that by an *admission* the suitability of the boat to the particular use, its general health, so to speak, in soundness, depth, length and width, together with the fact that it was laid down and built on proper lines, were each and all, by necessary inference, put out of the case as elements of negligence. The only reservation made by respondents' counsel in said admission (*q. v.*) as we construe the record, was that the oarlocks and the method of fastening the oars therein and to the boat were excepted from the scope and tenor of the admission, so far as the boat itself and its appliances are concerned.

In considering these oarlocks and the method of fastening them to the oar and to the gunwale, we are met by the fact that, under the evidence, they were the usual appliances in use on boats on like waters. To this condition of things the law applies several rules, viz., the master does not insure against *danger* but against *negligence*. He is bound to use ordinary care in supplying reasonably safe tools and appliances to his servant. But this does not mean that he is to conform to every new invention, nor yet that he must use the best tools and newest appliances obtainable. The test of negligence is the ordinary use of the business. The standard of ordinary care is the conduct of ordinarily prudent persons under like circumstances. The rules of law applicable to the facts of this case are, in matter and style, formulated in a way soothing to the legal mind in Titus v. Railroad, 136 Pa. St. 618, quoted approvingly by this court in Minnier v. Railroad, 167 Mo. l. c. 119, thus: "Some employments are essentially hazardous, . . . ; and it by no means follows that an employer is liable 'because a particular accident might have been prevented by some special device or precaution not in common use.' All the cases agree that the master is not

bound to use the newest and best appliances. He performs his duty when he furnishes those of ordinary character and reasonable safety, and the former is the test of the latter; for, in regard to the style or implement or nature of the mode of performance of any work, 'reasonably safe' means safe according to the usages and habits and ordinary risks of the business. Absolute safety is unattainable, and employers are not insurers. They are liable for the consequences, not of danger but of negligence; and the unbending test of negligence in methods, machinery, and appliances is the ordinary usage of the business. No man is held by law to a higher degree of skill than the fair average of his profession or trade, and the standard of due care is the conduct of the average prudent man. The test of negligence in employers is the same, and however strongly they may be convinced that there is a better or less dangerous way, no jury can be permitted to say that the usual and ordinary way, commonly adopted by those in the same business, is a negligent way for which liability shall be imposed. Juries must necessarily determine the responsibility of individual conduct, but they cannot be allowed to set up a standard which shall, in effect, dictate the customs or control the business of the community." To the same effect is Missouri case law, see, for example, Bohn v. Railroad, 106 Mo. l. c. 433-4; Steinhauser v. Spraul, 127 Mo. l. c. 562; Blanton v. Dold, 109 Mo. l. c. 74; Blundell v. Miller Mfg. Co., 189 Mo. 552.

The only evidence tending to show the want of due care in the selection of oarlocks is based on the showing that in a certain contingency a tight oar can not be unshipped, nor can the oarlock be withdrawn from the gunwale of the boat. But due care can not be settled by one incident or a single hypothesis. No oarsman would select an oarlock appliance with reference to one possible incident or one fortuitous combination of cir-

cumstances in rowing. Such selection would be determined by considering the greatest average merit of the oarlock appliances in the long run and for general use, and this is, broadly speaking, in line with the philosophy of Bentham's famous *dictum,* viz: that the right end of all human action is the creation of the largest balance of happiness. A method of determining the merits of a "U" oarlock, or "peg" oarlock and a loose oar, wherein one possible contingency would be allowed to control, would lead to the rejection of such appliances out of hand as unsuitable. For instance, loose oars are easily lost overboard and such an accident might leave the boat occupants helpless in choppy or in insidious waters. Again, in mechanics an oar is but a lever, the oarlock is the fulcrum, so that, given a loose oar, the distance from the fulcrum to the power or weight is liable to shift or vary between the oars and result in an uneven or unsteady stroke and prevent, in such contingency, true and safe rowing. In summing up the comparative merits of a tight oar and a loose oar, considering the general use of the oar and the variety of incidents to be met with in rowing, it would not appear that the merits in favor of one and against the other are appreciable; and when the rules of law aforesaid are applied to the conceded record facts here, it seems to us that the appellant was entitled to the instructions now under consideration.

III. If we are right in our holdings, aforesaid, then appellant was entitled to its instruction numbered 12 to the effect that there was no evidence upon which any negligence could be predicated of the use of the skiff in connection with the barge; for conceding that the barge anchored as it was in the stream was a proper craft to be used in the plan for repairing the cable, and conceding that the skiff and oarlocks were those in ordinary use by ordinary prudent persons in navigating the Missouri river and like waters, the principle invoked

in this instruction results as a matter of inexorable logic and proves itself.

IV.  One of the charges made against defendant is "that the failure of defendant to provide and furnish a sufficient number of oarsmen competent to safely row and run said skiff was wrongful, careless and negligent." Another is "that the conduct of defendant in transporting its said servants in said skiff as aforesaid with one of the two oarsmen rowing the same being unskilled and incompetent, was wrongful, careless and negligent." The same charge by other words is made against defendant in another paragraph of the petition.

In this condition of the pleadings, appellant asked and was refused certain instructions which told the jury, in effect, that there was no evidence of the negligence complained of in the aforesaid specifications.

In our opinion appellant was entitled to these declarations of law. Because: (1) it is conceded that Lambke was a competent oarsman; (2) it is conceded that there were two other competent oarsmen in appellant's employ, viz., Haines and Johnson; (3) it is uncontradicted that these men were assigned by appellant to assist Lambke in rowing; and (4) it is not pretended that more than two competent oarsmen were necessary. So that, the record before us established quite beyond cavil that appellant came up to high-water mark in the performance of the duty it owed its servants in this particular. If, then, in spite of the due care of appellant, its servants sought to follow a plan of their own, hatched on the spur of the moment and in the absence of appellant's foremen, unknown to them and therefore unsanctioned by them, and substituted an incompetent oarsman in the person of Byrnes, or if Byrnes obtruded himself without the knowledge of appellant in the office of oarsman with the permission of those in the skiff and refused Johnson permission to take the oars, the non-liability of appellant for this substituted and negligent plan of procedure and the results following its

adoption, is shown by a mere colorless and bald statement of the facts.

The master is not required to be present at every precise instant of time to anticipate and guard against whimsical negligence of those of his servants who are fellow-servants to each other, but he has the right to assume in such class of business as this, in the present state of the law, that his servants will act with good sense and discretion toward each other.

V. This brings us to the consideration of the only remaining feature of the plan adopted, to-wit, the cable and the strand—the one going over, and the other attached to, the barge and from thence both disappearing in the water and continuing thereunder to the shore. It is contended by respondents that this condition of things constituted actionable negligence, and in reply to this contention appellant insists, (1) that it was not negligent and that (2) the danger was incident to the work, and that it was obvious to decedent and, hence, that he assumed the risk.

At the threshold it may be said that in repairing a cable elevated on a ship, certain portions thereof would necessarily appear above the surface and other portions would be beneath. In this particular, the thing speaks for itself and it is not contended that any recognized plan for repairing a cable would omit or obviate this condition of things. Nor is it contended by respondents that the strand was an unnecessary element in the plan. The contention of respondents is that (1) it was allowed to sag in the water, and (2) that it not only sagged into the water but that the force of the current deflected it down stream, so that its exact position could not be calculated by an oarsman. If the boat had undertaken and pursued a course wholly east of the strand and an oar had fouled on that portion of the strand deflected down stream and lying in the course of the skiff, a different problem might possibly be presented to us for consideration. But the case made on the evidence is

that the boat got west of the strand, and, as the strand was attached to the south end of the barge, it must necessarily cross back to the east of the strand in reaching the landing at the east side of the barge, and, in doing so, Byrnes fouled his oar on the sunken strand or cable. So that, so far as the human eye can see, the same result would have followed whether the strand had been deflected down stream or whether it had pursued a course directly towards the shore from where it disappeared in the water. Assuming that appellant was not responsible for Byrnes's acting as oarsman, assuming further that his negligent use of the oar too deeply under water caused the disaster and that the boat with proper rowing would have safely crossed the strand at that spot, it would seem that the case on this head is disposed of before the question of the assumption of risks is reached. But if not so disposed of, the question is in the case and the contention of appellant that a mandatory instruction, to the effect that Chrismer assumed the risk, should not have been refused, as it was, bespeaks consideration.

Held against the current by wires fastened at one end to a dock up stream and to the barge at the other, it is self-evident that a barge so riding on the water would not of itself hold taut a strand at right angles to such wires, fastened to the south end of the barge and to the south shore. If such strand were kept taut above the water by other means its constant tendency would be to drag the barge shoreward and interfere with the work. The strand being put to the use of (1) working the barge shoreward, when such movement was necessary, and (2) to bring material from land, no reason is apparent why it might not be properly slackened into the water when out of use. That it was so slackened for two days prior to the accident was known to decedent. The fact of the cable being in the water was also known to him. The whole plan of procedure was known to him and he had taken part in putting all the appliances in

position.    That dangers attend all navigation and that peculiar dangers attended the navigation in question must be admitted, but these dangers of strand, cable, skiff, oars, oarlocks, barge, current and depth of water were all open and obvious to Chrismer, were incident to the business in hand and therefore were assumed by him as a matter of law in the absence of the active negligence of the master producing the injury.    [Fugler v. Bothe, 117 Mo. 475; Holloran v. Union Iron & Foundry Company, 133 Mo. 470; 2 Current Law, p. 828, and cases cited; 1 Labatt, Master & Servant, sec. 3.]    Appellant therefore was entitled to its mandatory instruction covering the risks indicated by the record.

As the result of the oral argument, the writer of this opinion differed from his brethren on the theory that appellant was liable for the negligence of Lambke in permitting Byrnes to row.    He was inclined to the view that in navigating the boat Lambke was captain of the craft and stood in the shoes of the master as a vice-principal, but a patient examination of the record shows such view fanciful and unsound under the pleadings in this cause.    Under the view entertained by us it will not be necessary to pass upon the other assignments of error.

Respondents' case should have been taken from the jury, and the judgment is therefore reversed.

All concur except *Valliant, J.,* who dissents.

PER CURIAM.—On hearing in Banc the foregoing opinion of LAMM, J., was adopted as the opinion of the court.  *Brace, C. J., Fox* and *Marshall, JJ.,* concurring; *Valliant, Gantt* and *Burgess, JJ.,* dissenting.

The judgment of the circuit court is accordingly reversed.

DISSENTING OPINION.

VALLIANT, J.—Plaintiffs are the minor children of Edward L. Chrismer deceased who, while in the service of the defendant, was drowned in the Missouri river in consequence of the capsizing of a skiff through, as the petition alleges, the negligence of the defendant.

The plaintiffs' testimony tended to show as follows: Defendant's telephone line crosses the Missouri river by a submerged cable at a point opposite Washington in Franklin county. The cable got out of repair and defendant sent a party of men to repair it. The party consisted of twelve men and was under the command of one Thompson as foreman, and one Caesar as sub-foreman, Thompson was first and Caesar was next, the rest of the party were mere linemen subject to the orders of those two.

The plan of operation adopted by Thompson was as follows: A barge, or common flatboat, was located in the river over or near the submerged cable, crosswise the current, and held in position by wire strands reaching to the shore. The cable was fished up from the bottom of the river and laid across the barge so that it could be handled and repaired; as one part would be repaired the barge would be moved so as to bring up and expose to view another part to be repaired and so on until the whole cable should be examined and repaired.

In addition to the wires that held the barge in position was another strand that was used as a means of conveyance by aid of a pulley to bring materials from the shore to the barge; this will be hereinafter called "the strand." When this strand was in use for this purpose it was all above water, but when not in use it was allowed to sag beneath the surface of the water, the ends, one fastened on the shore, the other on the barge, remaining above the water, the end at the barge extending out about 15 feet before dipping into the water; this

strand had not been in use for two days before the accident and had remained sagged in that manner.

For the purpose of transporting the men from the shore to the barge where they were to do their work, the foreman, Thompson, hired one Hugo Lambke with his skiff. The skiff was 15 feet 10 inches long, 16 inches deep, and 4 feet 4 inches wide; its normal capacity was to carry five men, it was designed for two sets of oars— swivel oars. A swivel oar was explained to be one in which a pin was fastened which when in use fitted into a socket in the gunwale of the boat, and formed the pivot on which the oar turned. The significance of this form of oarlock was that if the oar should get fastened to an obstruction in the water it could not be released from the oarlock and the boat was liable to capsize.

Lambke who owned the skiff was also employed by Thompson to row it. The substance of what was said in the hiring of Lambke was that Thompson told him he wanted to hire him and his skiff to carry the men to and from the barge as occasion required and bring them ice and water, to which Lambke agreed and entered on the work; the amount of wages was not mentioned, but when Lambke quit, which he did immediately after this accident, Thompson paid him at the rate of $2 a day, which was satisfactory. Caesar knew nothing of the agreement made by Thompson with Lambke and gave him no orders except to land at the down stream side of the barge. Lambke was nineteen years and ten months old; his occupation was that of a laborer in a cob-pipe manufactory; he had never followed boating for an occupation, but had owned this skiff about two years and had often gone in it fishing, rowing it himself, catching driftwood and had taken members of his own family across the river in it. He was the only man employed by the defendant to row this skiff. He testified that he had two sets of oars, one his own and one borrowed from a friend. "Q. Who, besides you, was employed to row that boat? A. They helped me out, that is

all. One day one man, and the next day another. They did not help me regularly—any special one. . . . Q. There was no regular man provided to pull the other set of oars? A. No, sir." On cross-examination he said that Johnson generally rowed with him and when he did not then Haines generally did. Sometimes Byrnes also rowed, he did so "once, twice, yes, sir, maybe more. I don't know just exactly." He considered Johnson and Haines very good oarsmen, he also considered Byrnes a pretty good oarsman. (Byrnes was the man whose awkward stroke caused the skiff to be capsized.) Sometimes also Thompson and Caesar helped to row.

The men boarded at a hotel in Washington, they were carried in the skiff every morning to the barge, back to shore at noon for dinner, returned to the barge after dinner and back again to shore at the end of the day's work. In this way the skiff, carrying half the party in one trip, made eight trips a day carrying the men, and two or three extra trips carrying ice and water, in which last-named trips Lambke rowed the boat alone.

No instructions were given to Lambke except to approach the barge at the down-stream side.

The work had thus been going on four or five days and was approaching conclusion; the foreman had notified the men at the close of the day that he desired to get an early start next morning, and accordingly about six o'clock, or shortly after, the skiff was loaded with Lambke and four of the men ready to start. Lambke had the bow oars, Byrnes the other pair, Chrismer was in the stern and the two other men in the next seat. Neither Thompson nor Caesar was present.

The point from which they started was a few feet above the shore end of the strand. They rowed up stream on that side of the river for some distance where the current was not so strong, aiming to drift with it when they should turn across stream and so effect an easier landing on the down-stream side of the barge,

which course would necessitate the crossing of the strand. But when they were approaching the barge and close to the strand, Byrnes made an awkward dip with his oar on the down-stream side of the skiff and it caught on the strand, and being a swivel oar he could not release it, and the consequence was the force of the current came against the imprisoned skiff and capsized it, throwing the men into the river, two of whom, Lambke being one, were rescued, but the three others, of whom the plaintiffs' father was one, were drowned. The current of the river at that point was from seven to ten miles an hour.

The testimony on the part of defendant was not materially different from that of the plaintiffs on the points above mentioned, but it brought out some other points.

The foreman, Thompson, testified that Chrismer and Byrnes had assisted in the work of putting the barge and strand in position, and knew how they were located. That ordinarily the skiff carrying the men started below the strand and did not cross it; that if they should go above the strand there would be danger of fouling with it if they attempted to cross it too near the barge. The barge was stationed about 250 or 275 feet from the shore and crosswise the stream. "Q. What arrangement did you make with Mr. Lambke about transporting the men? A. I told him I would like to have him and his skiff to transport the men from the shore to the barge as the work required." On cross-examination: "Q. And when you came to Washington you needed another man and so you hired Lambke? A. Needed the boat. Q. And the man too? A. Yes, sir. Q. So you hired Lambke? A. Yes, sir. . . . Q. What did you say to Lambke? A. That I should like to hire him and his boat. Q. For the company—you were not doing that on your own hook, you were acting for the company? A. Yes, sir. Q. What did you say to him about his wages? A. I don't think

I said anything to him at all about it.'' He also testified that he gave Lambke no orders and that no one was authorized to give him orders except Mr. Caesar and himself. Caesar testified that he did not know anything of the agreement between Thompson and Lambke, that he gave Lambke no orders except to land on the down-stream side of the barge; that he ordered Johnson and Haines to help Lambke row the boat; he did that because he knew them to be expert oarsmen, had never seen any one except Johnson and Haines helping to row except when Thompson or himself did so.

The defendant's testimony also tended to show that just as the skiff was starting off Johnson came in sight and called to them to stop the skiff and let him get in, but Byrnes answered, ''wait till next trip,'' and the boat went on. Also that Byrnes was awkward in handling the oars, dipped them too deep. Also that the most of the skiffs in use at Washington were equipped with swivel oars. During the cross-examination of one of plaintiffs' witnesses the following colloquy between counsel occurred: Counsel for defendant: ''Will counsel admit that this was a suitable boat and suitable appliances for crossing this river at this place?'' Counsel for plaintiff: ''It would be if those obstructions were not there? Q. Apart from obstructions and danger, you admit that this was a proper boat to cross this river at that place? A. Except for those appliances and obstructions, yes.''

The summary of the charges of negligence in the petition is that the skiff equipped and manned as it was under the circumstances to be operated in the presence of the submerged wires was not reasonably safe for the carrying of the men and that defendant was negligent in attempting to do so.

At the close of the plaintiffs' evidence and again at the close of all the evidence, the defendant asked the court to instruct the jury that the plaintiffs were not entitled to recover, the court refused the instruction and

defendant excepted. There was a verdict by ten of the jury for the plaintiffs for $3,200, and judgment accordingly, from which defendant has appealed.

The appeal was allowed to this court because at that time the constitutionality of the law authorizing a verdict of three-fourths of a jury had not been settled.

I. The question for our first consideration is, should the court have given the peremptory instruction asked by the defendant to the effect that the plaintiffs were not entitled to recover?

The deceased, Chrismer, plaintiffs' father, was an electric wire lineman and so far as we know from the record he had no knowledge whatever of skiffs or other boats or of the hazards of river navigation, and so were all the other men in the gang except that it is said of Johnson and Haines that they were good oarsmen, and of the ill-fated Brynes that he too was a pretty good oarsman—as oarsmen seem to have been accounted then and there. But whatever may be said of the others, Chrismer was ignorant of boating and exhibited no ambition to experiment in that line. He confided in his master to furnish him the necessary transportation, put himself in the vessel his master furnished him for that purpose and lost his life through the negligence of some one—was it his master's negligence?

It was the defendant's duty to furnish a reasonably safe boat, and to see that it was managed with reasonable care and skill, to carry its servants across the water. The transporting of these men back and forth across the river at this point, though capable of being accomplished with safety by the observance of due care, was nevertheless attended with danger and the care that was necessary to render it reasonably safe was the care that would be exercised by an ordinarily prudent person whose experience gave him knowledge of the conditions. The situation demanded of the master knowledge of the danger reasonably to be anticipated, knowledge of means reasonably calculated to avoid it, and ordinary

care to use such means. Before sending his servants into a field where danger is reasonably to be expected it is the duty of the master to know what the danger is, and to know what precautions are reasonably necessary to take to avoid it, he cannot hide his liability behind ignorance of the situation. The duty of the master in this respect is an imperative and continuing one. It may be delegated, but the person to whom it is delegated becomes in respect of it the master's *alter ego* and his neglect is the neglect of the master. [Rodney v. Railroad, 127 Mo. 676.] This duty is unending while the service continues. Therefore, when the master in this case provided this boat it became his boat, and when he provided a man to row it the man was his vice-principal.

In contemplation of law the master was or should have been in person or by representative ever present observing and directing the operation of the boat. If he was present and permitted the negligent operation he was liable for permitting it; if he was not present in person or by representative he was liable because he was negligently absent from his post of duty.

When Chrismer saw this boat in the hands of the man, ostensibly, at least, employed by the master to manage it, he had a right to trust both the boat and the man as the providence of his master.

Can we in the light of the evidence in this case say, as a matter of law, that this master so faithfully performed its duty that there can in reason be no two opinions about it? What did the master do? He hired Lambke and his skiff and thereafter trusted everything to his judgment and management. Thompson the foreman himself testified that he gave Lambke no orders, and Caesar said that the only order he gave him was to land against the barge on the down-stream side. Lambke was, therefore, permitted to take his own head for it and navigate the boat as to him seemed proper, and so he had been doing for five days in view of the foreman and in view of the men, in view of the master and in view

of the servant. Under those circumstances can the servant be blamed if he looked upon Lambke as the man entrusted by the master to observe the care required in the safe handling of the boat?

So far as appears from the plaintiffs' evidence the hiring of Lambke and his skiff is all that the master did; the assistance in rowing that Lambke received was voluntary and as might happen to be convenient from first one of the linemen and then another. Even the defendant's evidence on this point does not help its case much. Caesar testified that he ordered Johnson and Haines to help Lambke, because, he said, he knew them to be good oarsmen. Just what Caesar's own experience was or his ability for judging the capacity of these men in this particular does not appear. But there was no evidence that Chrismer or any of the other men knew that any one was detailed to help Lambke or that Lambke himself knew it. Chrismer saw sometimes one and sometimes another helping to row without any notice that any one was designated by the foreman for that purpose, therefore, he had a right to judge from what he saw that Lambke availed himself of the help of anyone who was willing to help, and when he saw Byrnes in the place of the helping oarsmen he had as much right to think that he was there by authority as if he had seen Johnson there.

But aside from the question of an efficient helper, is it so clear that that skiff and Lambke constituted an all-sufficient means of transportation that there was no question in that respect to submit to the jury? This court might perhaps be pardoned if it assumed to know something of the nature of the Missouri river, its swift current, its changing banks, its shifting sand bars, its muddy water hiding obstructions, its eddies and its whirlpools, but without judicial cognizance of that, the evidence shows sufficient of the nature of the river to indicate that the transporting of those men to and fro as was done was a dangerous act demanding that great

care should be observed by the master in guarding the lives of his servants who were trusting their lives to him.

Lambke was no skilled waterman, he was a landsman, a cob-pipe maker, who took to the river only occasionally for pleasure or an odd job. He was only nineteen years and ten months old. Can we say as a matter of law that he was so mature in years, so experienced and skillful in the handling of a boat that there is no question on that point to go to the jury? We sometimes read of skillful amateur oarsmen in college teams who are not older than this young man, but we do not find them giving specimens of skill in rowing a boat freighted with human life in the waters of a turbid river, and, anyway, if we were seeking to find a man possessed of that care and prudence and experience that is required for the dangerous work to which this young man was assigned we would not go to a team of college boys to find such a one.

Blame is chiefly laid on Byrnes whose awkward stroke caused his oar to foul, but we must remember that Byrnes was only a helper, he was not the chief oarsmen, he did not direct the course of the boat, he was not responsible for its going above the strand, necessitating the crossing of the strand to reach the downstream side of the barge, nor was he responsible for approaching too close to the end of the barge at the point when the strand dipped into the water, before attempting to cross. And if it be conceded that Brynes was unfit to handle the oars, Lambke, if he was himself fit to judge of his capacity in that respect, knew he was deficient, for he had rowed with him before. If, therefore, Byrnes was the cause of the accident and was unfit to handle the oars somebody was to blame for allowing him to attempt it—who was to blame? Certainly not Chrismer for he was no judge of such matters.

Lambke testified that on this occasion he took the course he usually took, that is, he first went above the

strand, aiming to come down across it to reach the down-stream side of the barge. Thompson, the foreman, testified that the skiff ordinarily started below the strand and did not cross it; he also testified that it was dangerous to cross it. Yet seeing, if he was paying any attention to it, that the skiff did, sometimes at least, go above the strand and come back across it, and knowing, as he said he did, that there was danger of the occurring of the very thing that did occur in this instance, he said he gave Lambke no order at all and Caesar gave none except to land at the down-stream side. That testimony seems to have been adduced by the defendant to support its theory advanced in its brief that Lambke was an independent contractor. In the brief for appellant at page 49 it is said: "They, therefore, employed a ferryman who owned a skiff. His name was Hugo Lambke. He did not become in any sense a servant of defendant, nor did he in anyway fall under the direction or control of defendant. . . . In this case, instead of using a steam ferry, they contracted with the owner of a skiff to do the ferrying, and Hugo Lambke in furnishing his skiff to transport the men back and forth was clearly an independent contractor."

If that was the case, then Lambke was not there in a representative capacity; he was the captain of the vessel, and he took orders from no one, he employed for his crew whom he chose, the foreman of the gang had no right to impose Johnson or Haines or anyone else on him; he had a right to select Brynes if he chose and, by acquiescence at least, on this occasion he did chose to let Byrnes take the oars. And if the master esteemed Lambke worthy of this trust and confided to his skill and judgment the lives of his servants, was it for the servant to question his master's providence?

Lambke was either the servant of the defendant and subject to its orders or he was an independent contractor. If he was a servant he was a servant to discharge the duty the master owed to these other servants,

and in that respect was the master's vice-principal and if he was negligent it was the master's negligence. If he was a servant, then, though as to others he was the master's vice-principal, yet as to the master he was subject to orders, and if he needed orders or directions the master was negligent if orders or directions were not given. If on the other hand he was an independent contractor, then he was master of the boat and Thompson and Caesar were right when they saw him going and coming the course he chose and gave him no orders.

The defendant having for the purpose of shifting its liability asserted that Lambke was an independent contractor, cannot with consistency treat him also as one whom the other servants were to regard only as a servant without authority to act except under orders of the foreman, and without authority to row the boat with the help of any one except one appointed for that purpose by the foreman. Whether the defendant can take shelter behind the independent contractor theory or not, it has assumed in its brief to say in effect that Lambke was in command of that boat by virtue of his employment, and in that respect we think the defendant is correct, that at least was what Chrismer and the other men had a right to suppose from what they saw of the management.

But even in the employment of an independent contractor the employer does not lay aside all responsibility; he is bound to use care to employ a competent man and if he would take shelter behind him he must be prepared to show that the man employed was a competent person in that line of work. In 1 Thompson on Negligence, sec. 621, it is said: "It is a general rule that one who has contracted with a competent and fit person, exercising an independent employment, to do a piece of work . . . will not be answerable for the wrongs of such contractor, his subcontractors or his

194 Sup—15

servants, committed in the prosecution of such work."
In the next section the author says: "In every case,
the decisive question is, had the defendant the right to
*control*, in the given particular, the conduct of the per-
son doing the wrong?"

The author then proceeds in pages following to
point out many exceptions or qualifications to the gen-
eral rule which it is unnecessary now to consider, be-
cause the facts in this case do not in our opinion bring
Lambke in the category of an independent contractor.
There is no evidence that he was engaged in the ferry
business or boating of any kind; such was not his avoca-
tion, he followed the business of making cob-pipes for
a living, he was not known as and did not profess to be
a contractor in river transportation of any kind. There
was evidence tending to show that he knew how to
row a skiff, but in the light of the evidence and of the
undisputed facts of the case his fitness for this work was
a subject on which, to state it most strongly for the de-
fendant, there might be two opinions. There was noth-
ing in the act of hiring that indicated an intention to
constitute Lambke an independent contractor. Thomp-
son said that he hired Lambke and his skiff and in the
end paid him two dollars a day; that is all that is shown
by the record on the subject. The fact that he gave
him no orders indicates only neglect of duty. It is said
as a defense that when the skiff started that morning
neither Thompson nor Caesar was present, but what
good would it have done if they had both been there,
since they would give no orders? This was not the first
time Byrnes had assisted Lambke in rowing and
Thompson and Caesar either saw him doing so or would
have seen him if they had paid attention or had cared
to observe the movements of the boat. But their whole
conduct shows that they treated Lambke as a compe-
tent person to man and manage the boat and trusted to
his judgment, put him, as it were, at the head of the
transportation department. If they treated him so and

held him out to Chrismer and the other men in that capacity, how can Chrismer and the others be blamed for putting the same trust and confidence in him?

The evidence points to the facts that Lambke was the master's accredited manager of that boat, and the master's vice-principal; it also tends to show that it was Lambke's negligence that caused the accident. That negligence consisted in allowing Byrnes to take the oars, in selecting the more dangerous course which necessitated the crossing of the strand, and in so directing the course of the boat as to attempt the crossing of the strand too close to the end of the barge where the strand was not deep in the water. These were all matters under Lambke's control and they combined to produce the accident.

There was evidence tending to show that Lambke could row a skiff, but ability to row a skiff under some conditions does not demonstrate ability to do so under other conditions, or prove one to be of sufficient judgment and skill to be entrusted with the lives of men under the circumstances shown in this case. Whether Lambke possessed such skill and judgment was, under the evidence, and in the light of the skill and judgment displayed by him on this occasion, a question for the jury. And though a skiff of the size, capacity and equipment of the one in evidence in this case may be a safe means of crossing the river under some conditions, yet it may not be so under other conditions, and whether the skiff in evidence in this case, taken with the provisions for its management and the peculiar circumstances shown in evidence, was a reasonably safe boat for the purpose was also a question for the jury.

On the whole case there was a showing of loose management indicating either that the danger had not been appreciated or proper care had not been taken to avoid it.

The court did not err in refusing the peremptory instruction asked by the defendant.

*Gantt,* and *Burgess, JJ.,* concur with the writer in the views expressed in this opinion.