## JOHN O'DOWD, Respondent, v. WABASH RAILROAD COMPANY, Appellant.

**Kansas City Court of Appeals.   October 7, 1912.**

1. **BILLS OF EXCEPTION: Time for Filing.** Under section 2029, R. S. 1909 as amended by the Legislature in 1911 (Session Laws of 1911, page 139), the appellant has an unqualified right to have his bill of exceptions signed and allowed at any time before he is required to serve the respondent with his abstract of the record.

2. **NEGLIGENCE: Master and Servant: Custom.** As a general rule, the master in conducting his business in the usual and customary manner, is not chargeable with negligence, but custom prevails upon the theory that experience has demonstrated that it is reasonably safe, and if an act is done in a negligent manner, it cannot be justified on the ground that it is the custom.

3. ————: ————. A switchman was injured while engaged in switching a car on to a track, at the other end of which another crew shoved in some cars that collided with the one in charge of plaintiff. The yards were so situated that the switching crew, at one end, could not see the plaintiff and his associates. *Held,* that under the evidence the court was fully justified in submitting the case to the jury upon the question whether or not the switching that caused plaintiff's injury was done in an negligent manner.

Appeal from Jackson Circuit Court.—*Hon. Thomas J. Seehorn,* Judge.

AFFIRMED.

*J. L. Minnis* and *Sebree, Conrad & Wendorff* for appellant.

*T. V. Conrad* and *T. A. Witten* for respondent.

BROADDUS, P. J.—This is a suit for damages, the alleged result of defendant's negligence.

The plaintiff, an experienced switchman, while engaged as such in defendant's employ, was injured in September, 1908, in its Kansas City yards, immediately north of the Union Depot. He had been in defendant's employment for more than one year, and was familiar with the yards and the manner in which the business of switching was conducted. In the switch yards there are numerous tracks, but it will only be necessary to account for those that relate particularly to the issues of the case. There was a main track running through the yards from a northeasterly to a southwesterly direction, which is referred to as the lead track. But for convenience the ends of the track are designated as north and south. It connects with the Burlington Railroad tracks at the north end and extends through the yards in a circular manner to the westwards at the south end, so that a crew working at the south end would be unable to see the north end on account of cars standing on the west side of said track, and on other tracks in the yards. About two car lengths from the junction of the said track with the Burlington track, a track diverges from the lead track on the east side, known as track No. 8.

At the time of the accident, a string of cars was standing on track No. 8 and extending near enough to the lead track to leave just sufficient room for cars moving upon the lead track to clear them. There were two switching crews at the time working in the yards. The plaintiff, with one crew, belonged to the north end, the other crew at the south end.

The plaintiff and his crew were to move four cars on track No. 8 by taking three in their order, the first, third, and fourth, and drop them down the lead track and to replace the second on track No. 8. To do this, they uncoupled the first four cars on track No. 8 and drew them upon the lead track to a sufficient distance to clear the intersection with No. 8. They then uncoupled the two cars at the south end of these four

cars and dropped them down the lead track, while plaintiff, at the direction of the foreman, went upon the second car to ride it back upon track No. 8. After going upon this car and finding the brake in order, he looked down track No. 8 and, finding the cars standing still, gave the signal to uncouple the car. He adjusted his brake, saw the car was under his control, and then when he reached the switch leading to track No. 8, he again looked to see that the cars on it were still standing, whereupon he loosened his brake and gave the car sufficient speed to run it on track No. 8. At the same time the crew at the south end were shoving cars on track No. 8 northward. Plaintiff saw the cars moving towards him, but not in time to seek a place of safety before they collided with his car. In the collision he was thrown from his position and injured.

The plaintiff denied that, when passing track No. 8, he knew that the crew at the south end were shoving cars on said track northward. And he testified that, owing to a curve in the track and it being occupied with cars, the south crew could not see where he was working, and that he first discovered that the cars were moving north, meeting him as he was passing over the frog connecting the two tracks.

He was then ansked if he looked any more. A. "Not for about another car length. I was busy setting the brake. I could not set up the brake and look at the same time, if I did, the car would stop." The grade was down hill. He said: "You have got to let off a little bit of the brake at a time, and ramble down that way. If you let it go, the car in five or six lengths would be going ten or fifteen miles an hour down that hill."

The evidence showed that there was space enough on the track for four other cars. The crew at the south end shoved two cars into this space, which caused the movement northward of the cars on the track until they

came in collision with the car going southward, on which plaintiff was placed.

Plaintiff was asked: "If you knew you had plenty of space to set in a car without cornering one on the other track would you send a man ahead of your string of cars? A. Not if I knew that I had plenty of room to spare—not necessarily—if I could see where we were going, but if you couldn't see ahead you have got to protect yourself and the company's property, etc.

Q. "Who would you be expecting to protect by sending the man in the field? A. If you knew there was another crew there, and didn't know exactly where they were at, you would get a man out there before you shoved up—if you cared for what you were doing —if you were looking out for the company's interest, and your fellow men.

Q. "You are saying, 'if the track was full.' I am saying if you had space for four cars, and only wanted to put in two, you would know that you could put in two cars in a space enough for four cars, wouldn't you? A. You could if the track was not full.

Q. "I say, if you had space enough for four cars, the track wouldn't be full then, would it? A. Yes, it might be.

Q. "How could it be full? A. That track would be practically full, if you wanted to shove in there around the curve—unless you find out there is no crew working at the other end." He was then asked to explain his meaning. His answer was thus. "There is a crew working at the other end, and you don't know but what they may drop two cars in at the other end, and you take two cars in, and you were figuring on space for four cars, and you haven't got it. You are not protecting yourself."

The defendant's evidence tended to show that the switching crew at the south end was working in the usual and ordinary manner employed by railroads under similar circumstances, that is, that it was the gen-

eral custom of railroads and the custom of defendant in its switching yards, where the tracks connect at both ends of the yard with a lead, as in this instance, for crews to switch at either end of the yard at the same time, and use the same track at the same time, and neither crew had any preference or right of way over the other crew. In other words, if there was a vacant piece of track, any crew had the right to move cars upon and occupy such space, regardless of where the other crew were, or what they were doing.

In the collision plaintiff fell to the ground and sustained a sever injury to one of his hands. He suffered much pain, and was unable to work for a period of six months. He testified, that at the time of his injury, he was earning from three dollars and fifty cents to three dollars and eighty-five cents per day.

The jury returned a verdict for plaintiff in the sum of $1000. From the judgment of the court on the verdict, defendant appealed.

The plaintiff has moved to strike defendant's bill of exceptions from the record, because it was not allowed, signed and filed in the time fixed by the court.

At the January term of the court for 1911, and on the 28th day of March, appeal was allowed and defendant given until the 9th day of the following September to file its bill of exceptions. For good cause shown, defendant was allowed other extensions of time to file its bill of exceptions, the last extension being until the 15th day of January, 1912. The bill was signed, sealed, filed and made a part of the record on the 24th day of February, 1912, more than one month after the time allowed for that purpose.

The decision of the question involves the construction of section 2029, pages 139, 140 of the Session Laws of Missouri, 1911, which reads as follows: "That section 2029 of article 15 of chapter 21 of the Revised Statutes of the State of Missouri of 1909 be and the same is hereby repealed, and the following new section

enacted in lieu thereof, to be known as section 2029: Section 2029. Such exceptions may be written and filed at the time or during the term of the court at which it is taken, or within such time thereafter as the court may by an order entered of record allow, which may be extended by the court or judge in vacation for good cause shown, or within the time the parties to the suit in which such bill of exceptions is proposed to be filed, or their attorneys may thereafter in writing agree upon, which said agreement shall be filed by the clerk in said suit and copied into the transcript of record when sent to the Supreme Court or Court of Appeals: Provided, in all cases now and hereafter pending on appeal in the Supreme Court and in any of the courts of appeals, the bills of exceptions therein may be allowed by the trial court, or the judge thereof in vacation, and filed in such court, or with the clerk thereof in vacation, at any time before the appellant shall be required by the rules of such appellate courts respectively to serve his abstract of the record, and for the purpose of determining whether such bill of exceptions shall have been filed within such time such appellate court shall make reference to its docket: Provided, that if for any reason the bill of exceptions cannot be allowed and filed within the time above provided, then the judge before whom such case was tried shall certify in writing such fact to the appellate court in which the appeal is pending, and such appellate court shall reset or continue such case for a sufficient time within which to enable such bill of exceptions to be allowed and filed, and in that event the time within which such bill of exceptions may be allowed and filed shall be determined by the time within which appellant's abstract must be served after such resetting or continuance. Hereafter, no case now, or hereafter pending in any appellate court, shall be affirmed for failure to file a bill of exceptions within the time allowed by the trial court, but such case may be affirmed

for failure to file a bill of exceptions within the time in this section provided, if error do not appear in the record of the case. All exceptions taken during the trial of a cause or issue before the same jury shall be embraced in the same bill of exceptions.''

The act purported to repeal section 2029 as it stood at that time, but it was more in the nature of an amendment, as the old section was copied in the new, and the two provisos added.

The purpose of the Legislature was to allow bills of exceptions to be filed when, for any cause, the appealing party had not complied with the provisions of the section as it stood before the amendment, and as incorporated therein. The first proviso authorizes the trial court, or the judge in vacation, to allow the bill of exceptions at any time before the appellant is required by the rules of the appellate court to serve his abstract of record on the respondent.

The second proviso is to save to the appellant the right to his bill of exceptions if for *any reason* it cannot be allowed and filed within the time *above provided*. It will be noticed that under the first proviso the right of the appellant to his bill of exceptions is an unqualified right. He does not have to assign any reason why he should have his bill. He has only to present it and have it allowed if he makes application to the court, or the judge in vacation, at any time before he is required to serve the respondent with his abstract of the record.

The appellant's right to a bill of exceptions in the second proviso is not an unqualified right. He must assign some reason therefor. In this case the bill of exceptions was allowed, signed and filed twenty days before the appellant was required to serve respondent with a copy of his abstract, all strictly within the time provided in said first proviso.

But respondent contends that the purpose of the proviso was to limit the power of the trial court so

that it shall not extend the time beyond the time when the abstract should be come due; that any other construction would nullify the first part of the section. If respondent's contention be true, the proviso would mean nothing. It would be a mere nullity.

It is not our purpose to criticise the law as amended, for the purpose of its enactment is commendable, and it should be liberally construed. There is not inconsistency in any of its provisions, although there may appear to be such owning to its construction.

The first part, requiring that the bill of exceptions shall be made and filed during the term at which the trial of the case is had, or at some future time as agreed by the parties or designated by the court, is in no way inconsistent with the proviso that it may be made and filed twenty days before the appellant is required to serve his abstract. The section, as it stands, merely gives the appellant three opportunities for obtaining his bill, where formerly he had only one. For the reasons given the motion is overruled.

The theory on which the case was tried is found in instruction No. 3 given on the part of the plaintiff, and instruction No. 5 given on behalf of defendant.

Instruction No. 3 reads as folows: "The court instructs the jury that if you shall find and believe from the evidence that on the 9th day of September, 1908, plaintiff was in the employ of the defendant in its switch yards in Kansas City, Missouri, in the capacity of a switchman, and under the orders of its foreman, John Rhodes; that while he was so employed and in the discharge of his employment as such switchman at a point near the north end of said switch yards, the defendant was working another switching crew at the south end of said yards engaged in switching cars on the same track upon which plaintiff and his crew at the north end of said yards was similarly engaged; that the switching crew at the south end of said yards

knew or had reasonable cause to know that the crew in which plaintiff was engaged was using the track in controversy, or if they knew or had reasonable cause to know that the crew in which plaintiff was engaged, would in all reasonable probability in the discharge of their regular and customary employment, be using the track in question at the same time that they were using the same, then it became and was the duty of the crew engaged at the south end of said yards to use ordinary care, while switching said cars, to avoid colliding with cars upon which plaintiff was so engaged; and if you shall further find and believe from the evidence that while plaintiff was riding one of defendant's cars in a southerly direction from the north end of said yards in obedience to directions of his foreman, or in the regular discharge of his employment, on and over track No. 8 in said yards, and that while so engaged and under all the circumstances herein defined, the crew at the south end of said yards negligently and carelessly failed to exercise such care as reasonably prudent persons would exercise under like or similar circumstances to avoid colliding with cars so being switched by the crew at the north end of said yards, and as a direct result thereof the cars, so being switched in a northerly direction by the south crew, were caused to collide with car on which plaintiff was riding and as a direct result thereof plaintiff was injured, then your verdict must be for the plaintiff.

"Provided you further find from the evidence that plaintiff was, at said time and place, in the exercise of such care for his own safety as a reasonably prudent person would exercise under the same or similar circumstances."

Instruction No. 5 reads as follows: "The court instructs the jury that the defendant was under no obligation to warn plaintiff of the movement of the cars on track 8 from the opposite end from where plaintiff was working, in the direction of plaintiff, by the crew

working at the opposite end of the yards from where plaintiff was working, but that it was plaintiff's duty to keep a lookout for cars being moved on said track 8, and to use ordinary care to prevent the car upon which he was riding from coming in collision with said cars.

"And the court further instructs the jury that if they believe from the evidence that plaintiff saw, or by the exercise of ordinary care could have seen the cars moving toward him on track 8, in time to have stopped the car on which he was riding, in time to have prevented it from colliding with the other cars, then the plaintiff cannot recover and your verdict must be for the defendant."

The defendant also offered a demurrer to plaintiff's case. The defendant assigns as error, the action of the court in refusing its demurrer to plaintiff's case, the giving of said instruction No. 3, and the instruction to the jury on plaintiff's measure of damages.

In the first place, it is argued that, under the evidence, the plaintiff's injury was the result of the risk of his employment. In other words, that he was injured in the collision by the acts of his fellow-servants while engaged in their work, carried on in the usual and customary manner.

It is a general rule that the master, in conducting his business in the usual and customary manner, is not chargeable with negligence. [Cunningham v. Journal Company, 95 Mo. App. 47; Chrismer v. Bell Telephone Co., 194 Mo. 189; Brands v. St. Louis Car Co., 213 Mo. 698, and other cases.]

The evidence, we think, was conclusive that the usual custom is, that when two crews are switching at different ends in the same yards, it is the duty of each switchman employed in the work to look out for his own safety, and no duty rests upon either crew to warn the other of its movements. That is as far as the custom prevailed. The law contemplates that whatever

the custom may be, it does not exclude reasonable care. While one of the switching crews was not bound to notify the other of its intended movements, yet it was bound to exercise reasonable care with reference to the safety of the other. One crew, under the circumstances, could not act without regard to the movements of the other and justify its course under the general custom. Notwithstanding the crew at the south end may have had the right to use track No. 8 at the same time it was being used by plaintiff's crew, the former was in duty bound, in so doing, to use every reasonable precaution to avoid collision with the latter.

Custom prevails upon the theory that experience has demonstrated that it is reasonably safe. But, if the act is done in a negligent manner, it cannot be justified on the ground that it is the custom.

The evidence tended to show that the crew at the south end switched cars onto track No. 8 in reckless disregard of the safety of the other crew, when it knew or could have known that the other crew was also at the same time switching cars onto said track. The force of the collision was so great that plaintiff was thrown from his position, notwithstanding he saw the danger and did his best to save himself from falling.

There was a conflict in the evidence as to whether the one crew had the right, under the custom, to switch cars on the same track when another crew at the other end was switching, and the court would have been justified in submitting the case to the jury on the weight of evidence as to whether or not it was negligence on the part of the crew at the south end in switching as they did onto said track while the north crew was also so engaged. But the court was fully justified in submitting the case to the jury as it did in said instruction No. 3, upon the question, whether or not the switching that caused plaintiff's injury was done in a negligent manner.

There is no inconsistency between plaintiff's and defendant's instruction; and plaintiff's instruction on his measure of damages is not subject to the objection made by defendant. The case was well tried, and the judgment is not excessive and is for the right party. Affirmed. All concur.