ANTONY SUSTAR, Respondent, v. BAMBRICK
   BROTHERS CONSTRUCTION COMPANY, Ap-
   pellant.

**St. Louis Court of Appeals, December 31, 1913.**

1. MASTER AND SERVANT: Injury to Servant: Incompetent
   Fellow Servant: Liability of Master. In order to cast liability
   on the master for an injury to a servant, caused by the act
   of a fellow servant, on the ground that the fellow servant was
   habitually incompetent or negligent, the general rule is, that
   it must appear that the negligent servant was habitually in-
   competent or negligent, and that such fact was known to the
   master, or by ordinary care could have been known to him,
   and that after having such actual or constructive knowledge,
   he retained the incompetent or negligent servant in his em-
   ploy.

2. ———: ———: ———: Sufficiency of Evidence. In an action
   for injuries to a servant working in a sewer trench, as a result
   of the negligence of the signalman in charge of the sewer
   machine in failing to see that the buckets were hoisted to a
   sufficient height to clear the crossbeams of the machinery, by
   which one of them was dumped and the stone it contained
   precipitated on plaintiff below, evidence *held* to require sub-
   mission to the jury of the question of the incompetency of
   the signalman and the master's negligence in keeping him in
   such a position, when it knew, or by the exercise of ordinary
   care could have known, that he was incompetent. [REYNOLDS,
   P. J., dissents.]

3. ———: ———: ———: Instructions. In an action for injuries
   to a servant working in a sewer trench. as a result of the negli-
   gence of the signalman in charge of the sewer machine in
   failing to see that the buckets were hoisted to a sufficient
   height to clear the crossbeams of. the machinery, by which
   one of them was dumped and the stone it contained precipi-
   tated on plaintiff below, an instruction that if defendant neg-
   ligently employed and retained an incompetent and unskilled
   signalman who was not reasonably competent and fit to per-
   form his duties, and because of such incompetency he caused
   the carriage to be started and moved along the track while
   one of the buckets was hanging so low that it struck a cross-
   beam and was caused to tip and spill a rock on plaintiff, and
   defendant knew, or by ordinary care would have known, of the
   unfitness and incompetency of the signalman and the danger to

plaintiff by reason thereof, the verdict should be for plaintiff, was not objectionable, either on the ground that the jury were not required to find that the signalman actually signaled the engineer to start the carriage when the buckets had not been raised to the proper height, or as assuming that the signalman was incompetent.

4. ———: ———: ———: Instructions. In an action for injuries to a servant working in a sewer trench, as a result of the negligence of the signalman in charge of the sewer machine in failing to see that the buckets were hoisted to a sufficient height to clear the crossbeams of the machinery, by which one of them was dumped' and the stone it contained precipitated on plaintiff below, the court instructed that if defendant operated a carriage on a track extending along the top of the sewer, and large buckets were conveyed along the track, by means of cables, over the place where plaintiff was required to stand, and the buckets, "while so customarily operated," were hanging so low that they came in contact with a crossbeam, and one of the buckets was tipped and a rock spilled out, which struck plaintiff, and that defendant had adopted and used at said time a plan which was not reasonably safe, in that the buckets were likely to tilt and swing and strike the crossbeam and to spill their contents, and that defendant knew, or by ordinary care should have known, that the plan was not reasonably safe, and such negligence, if any, directly caused the injury, plaintiff could recover. *Held*, that the words "while so customarily operated" should not be construed to mean that the jury should find that the customary or normal way of handling the carriage and buckets adopted by defendant was to move the carriage when the buckets were so low that they came in contact with crossbeams, but should be construed to mean that jury should find that, on the occasion in question, the buckets were hanging so low that they came in contact with the beams; and hence the instruction was not vulnerable to the objection that it was bad because there was no evidence tending to prove that the apparatus was customarily operated in a negligent manner.

5. ———: ———: Defective Appliances: Unsafe Plan of Operation. A sewer machine consisting of a carriage carrying buckets was operated upon wheels along an elevated track extending along and above the top of the sewer. This track was supported by a trestle, which stood upon timbers laid across the sewer. The trench was dug by filling large buckets therein, which were hoisted and conveyed by the carriage along the track and dumped. The rails of the elevated track were held in place by crossbeams. The greatest possible clearance between the buckets and the crossbeams was a foot or fourteen

Sustar v. Construction Co.

inches and the buckets were ordinarily stopped at a height of only from four to six inches above the crossbeams. While the buckets were ascending rather rapidly, it was necessary for the signalman to cause them to be stopped and caught by a ratchet arrangement before they ascended high enough to forcibly strike or interfere with the machinery above and when they were sufficiently high to clear the crossbeams. The ratchet arrangement was such that, if one of the dogs missed a tooth on the ratchet wheel, the bucket would drop back about eight inches. The buckets were suspended by cables attached to the bails thereof, and the entire operation was a rapid one. *Held*, that this method of operation was such that danger inhered therein with respect to the buckets striking the crossbeams and tilting so as to cause them to spill their contents on the heads of the unprotected workmen beneath; and hence a finding that the plan of operation was not a reasonably safe one was justified.

6. ———: ———: **Unsafe Plan of Operation: Incompetency of Fellow Servant: Consistency.** In an action for injuries to a servant working in a sewer trench, caused by a bucket, which was being elevated by means of a cable, striking a crossbeam and tilting over and precipitating stone it contained on plaintiff below, *held* that a theory of negligence that the servant in charge of the hoisting was negligent in failing to see that the bucket was hoisted to a sufficient height to clear the crossbeam was not inconsistent with a theory that the master was negligent in adopting a plan of operation which was not reasonably safe.

7. ———: ———: **Defective Appliances: Unsafe Plan of Operation: Instructions.** In an action for injuries to a servant working in a sewer trench, caused by a bucket, which was being elevated by means of a cable, striking a crossbeam and tilting over and precipitating stone it contained on plaintiff below, the court instructed the jury that if they believed that the conveying machine was negligently constructed, arranged and used, in that the space between the bottoms of the buckets and the crossbeams was so small that there was immediate danger, in operating the buckets, of the lower ends thereof striking the crossbeams and spilling their contents, and that defendant knew, or by the exercise of ordinary care should have known, thereof, and that it was dangerous to plaintiff, while engaged in his work, for the buckets to be so operated, and that the buckets were apt to swing, tilt and strike the cross-beams and injure plaintiff, and that such negligence of defendant, if any, directly caused one of the buckets to strike a crossbeam and tilt and spill the rock and injure plaintiff,

then their verdict should be for plaintiff. *Held*, that this instruction does not proceed upon the theory that defendant was negligent in using the type of machine used, but proceeds upon the theory that the machinery was negligently arranged and placed, in that, as the parts were then correlated and operated, the space between the bottom of the buckets was too small for the safe operation of the machine, and that this was the cause of the injury; and hence it is not vulnerable to the objection that it was not supported by the evidence, in that the testimony showed that the machine was of standard type.

[REYNOLDS, P. J., *dissents*.]

Appeal from St. Louis City Circuit Court.—*Hon. Hugo Muench*, Judge.

AFFIRMED.

*T. J. Rowe* and *Seddon & Holland* for appellant.

(1) The court erred in refusing to give the peremptory instruction asked by appellant at the close of all the evidence. Brands v. Car Co., 213 Mo. 698; Steinhauser v. Spraul, 127 Mo. 562; Chrismer v. Tel. Co., 194 Mo. 189; Epperson v. Tel. Co., 155 Mo. 346. (2) The court erred in giving instruction No. 1 at the instance of respondent. Said instruction is set out in full under heading II of Argument, infra. Lukamiski v. Steel Co., 142 S. W. 1097; Gorham v. Railroad, 113 Mo. 408. (3) The court erred in giving instruction No. 2 at the instance of respondent. Said instruction is set out in full under heading III of Argument, infra. Brands v. Car Co., 213 Mo. 698; Henschen v. Railroad, 56 Mo. 289; Price v. Railroad, 77 Mo. 508; Smith v. Railroad, 125 Mo. App. 120; Walleck v. Transit Co., 123 Mo. App. 160. (4) The court erred in giving instruction No. 3 at the instance of respondent. See authorities cited under heading III. (5) The court erred in refusing to give instruction B at the instance of appellant. Chrismer v. Tel. Co., 194 Mo. 189. (6) The court erred in refusing to give instruction F at the in-

stance of appellant. Said instruction is set out in full under heading VI of Argument, infra.

*Hall & Dame* for respondent.

(1) It was not error to refuse appellant's peremptory instruction offered at the close of the whole case. (a) All facts essential to the charge of employing and retaining an incompetent and inexperienced signal man were in the proof. Tucker v. Tel. Co., 132 Mo. App. 418; Allen v. Lumber Co., 157 S. W. 661. (b) There was evidence to go to the jury on the charge that the method or plan was negligent. Miles v. Coal & Coke Co., 157 S. W. 867. (c) The charge of negligently constructed, arranged and used machine was sustained by the evidence. Austin v. Shoe Co., 158 S. W. 709; Schiller v. Breweries Co., 156 Mo. App. 569; Brunke v. Tel. Co., 115 Mo. App. 38. (2) Respondent's first instruction on ground of incompetent signal man is not erroneous. (a) Facts as stated in the instruction constitute negligence in law. Tucker v. Tel. Co., 132 Mo. App. 418; Allen v. Lumber Co., 157 S. W. 666. (b) All the elements of actionable negligence are present and the law of the facts was properly declared, and if it could be claimed that there is any defect in said instruction, it is cured by instructions numbered V, VI, VII, and IX, given at instance of appellant. Anderson v. Union T. Co., 161 Mo. 411; Gordon v. Burris, 153 Mo. 223; Pray v. Union Cas. Co., 73 Mo. App. 679. (3) There is no error in respondent's instruction No. II, on charge of negligence in reference to unsafe plan. (a) It was not inconsistent with respondent's instruction No. I. Radtke v. Basket & Box Co., 229 Mo. 16. (b) It is supported by the evidence, and proper in form. (c) After verdict the allegations of negligence will, if they may, without violence to reason, be reconciled and harmonized; and should be liberally construed (Sec. 1831, R.

S. 1909). The verdict is for the right party. Sharp
v. Railroad, 213 Mo. 525; Gaedes v. Railroad, 143 S.
W. 565, 161 Mo. App. 225; Long v. Coal & Iron Co.,
233 Mo. 713; Kelley v. Railroad, 153 Mo. App. 114;
Barry v. Railroad, 98 Mo. 73. (d) Appellant did not
file any motion to elect, and its claim now after ver-
dict for first time that said first and second grounds
are inconsistent, comes too late. (e) The method or
plan in actual use was adopted by defendant, and that
method or plan was obviously unsafe. Brubaker v.
Electric Light Co., 130 Mo. App. 439. (4) Instruc-
tion No. III given at instance of respondent, on charge
of negligence in reference to negligently constructed,
used and arranged machine was proper. There was
direct and substantial evidence and evidence from
which the jury might infer that the machine as con-
structed and used was not reasonably safe. (a) The
question whether the paticular machinery provided by
the master is proper and suitable is to be determined
by the actual condition of its operation and not by com-
paring it with other machinery. Schiller v. Breweries
Co., 156 Mo. App. 569; Austin v. Shoe Co., 158 S. W.
709. (b) Said instruction is not inconsistent with in-
struction No. 1. The allegations of a petition should
be liberally construed with a view to substantial jus-
tice, being attacked after verdict for first time. Sec.
1831, R. S. 1909; Sharp v. Railroad, 213 Mo. 525;
Gaedes v. Railroad, 161 Mo. App. 225; Long v. Coal &
Iron Co., 233 Mo. 73. (5) The court did not err in
refusing to give instruction "B" offered by appellant,
because: There was abundant evidence of the unsafe
method or plan. As it was proper to give instruction
No. II for respondent on charge of negligence of un-
safe method or plan, discussed under point III of this
brief, then instruction "B" for appellant was properly
refused. See authorities under point III, supra. (6)
The court did not err in refusing to give instruction
No. "F" offered by appellant, that is to instruct the

jury that respondent was not entitled to recover on the charge of incompetent signal man. Refusal to give said instruction was proper, because there was abundant evidence to support said charge of negligence. See authorities under point II (a), supra.

ALLEN, J.—This is an action by plaintiff to recover for personal injuries received by him, while engaged as a servant of defendant, alleged to have been sustained through the negligence of the latter. Plaintiff recovered and the defendant prosecutes the appeal.

On July 24, 1911, plaintiff was in the employ of defendant, assisting in the construction of a certain sewer in the city of St. Louis. At the time of his injury, he was working in a trench which was being dug by means of the operation of what is known as a sewer machine. The latter consisted of a certain "carriage" carrying buckets, and was operated upon wheels along an elevated track extending along and above the top of the sewer, some fifteen feet or more above plaintiff. This track was supported by a sort of trestle which stood upon timbers laid across the sewer. The trestle and track extended for some distance along the sewer; and the trench was dug by filling large buckets therein, which were hoisted and conveyed by the carriage along the elevated track and dumped. The rails of the elevated track were held in place by certain crossbeams, the upper edges thereof being a little lower than the tops of the rails, in order that the flanges of the wheels of the carriage would not strike them.

On the day plaintiff received his injuries he was working at certain concrete work which was being placed in a portion of the sewer which had been dug. The trench was being dug, ahead of him, and the buckets containing the material hoisted therefrom were being carried along from time to time by the carriage

directly over the place where plaintiff was working.
Upon the occasion in question the bottom of one of
these buckets, containing a large rock weighing it is
said some eighty or ninety pounds, was permitted to
strike one of the crossbeams of the elevated track,
causing this rock to fall from the bucket, and which,
after striking one of the crossbeams, fell upon plain-
tiff while engaged in his work below, striking him upon
the head and inflicting very serious and permanent in-
juries.

To an understanding of the assignments of neg-
ligence upon which the case was tried some further
explanation of the operation of the sewer machine is
necessary. The carriage was operated along the ele-
vated track, and the buckets were raised and lowered,
by an engine situated some distance down the track,
and which performed both of these operations by
means of cables running therefrom to the carriage. A
signal man stood upon the platform of the carriage
and gave signals to the engineer with respect to the
hoisting of the buckets, the stopping of the same at
the proper height and the operation of the carriage
along the track. When the buckets were filled in the
trench below, a signal was given to the engineer to
raise them. When they had been raised to the proper
height it was the duty of the signal man to signal the
engineer in order to stop their upward movement. It
seems that there was a ratchet arrangement provided,
to prevent the buckets from being raised too high and
likewise from falling back after they had been elevated.
After the signal man had signalled the engineer to
check the upward movement of the buckets, it was the
duty of the former to throw a lever to cause what is
called the "dogs" to catch in the teeth of the ratchet
wheels to prevent the buckets from ascending higher or
from falling back. Then it was his duty to signal the
engineer to release a certain brake and convey the car-
riage along the track in order to dump the buckets.

There was expert testimony to the effect that the total possible clearance that could be arranged to be had between the bottom of the buckets and the crossbeams was something like two feet; though there was testimony that as this particular machine was then "rigged up" and operated the largest possible clearance was a foot or fourteen inches. It appears that each of these large buckets had a bail, to which was welded a strip of iron with a holt in it to receive a hook which was fastened to the cable. It seems that defendant was using eight of these buckets, of almost exactly the same size, two of them being hoisted or lowered at a time, and the others being down in the trench to be filled. It appears that the hooks for lifting the buckets were attached to the cable by means of clamps and that the height to which the buckets might be raised above the crossbeams depended somewhat upon the location of these clamps. There was also testimony, by an expert witness of defendant, that the ratchet arrangement above mentioned, to hold the buckets in place after they had been elevated, was such that if one of the "dogs" should just miss one "tooth" of the ratchet the bucket would drop back a distance of about eight inches before the "dog" would catch the next "tooth" and sustain it.

The cause was tried upon three of the assignments of negligence charged in the petition, and it is unnecessary to notice the others therein contained.

One assignment of negligence is that the defendant negligently employed and retained an incompetent and unskilled signal man, whose duty it was to signal the engineer in lifting and conveying the buckets above mentioned. And it is charged that on the occasion in question the said signal man signalled the engineer to cause a bucket to be started along the track, before it had been elevated to its proper position to be so moved, and when it was hanging so low that it

would strike and come in contact with the crossbeams, whereby the rock was caused to fall and injure plaintiff. And it is charged that the signal man performing said duties at the time was not reasonably fit and qualified to perform the same; and that defendant negligently retained him in its employ, when defendant knew, or by the exercise of ordinary care would have known, of his unfitness and incompetency.

Another assignment of negligence is to the effect that the method or plan which defendant was pursuing at the time of plaintiff's injury, in conveying the buckets along the track, and over the sewer, was not a reasonably safe one; and that it was not reasonably safe for plaintiff to work in the sewer while such buckets were being so conveyed along and over the same, for the reason that they, as so operated, were likely to tilt and swing violently and to strike a crossbeam and spill their contents. And that defendant knew, or by the exercise of ordinary care would have known that such plan was not reasonably safe.

A third assignment of negligence is that the conveying machine, above mentioned, then used and operated by defendant, "was so negligently constructed, arranged and used, and that the said crossbeams were so negligently fixed, placed and maintained by defendant, that the space between the bottom of said buckets and the said braces, when said buckets were conveyed along said track, was too small, so that there was great danger, in the swinging or tilting of said buckets, of the bottom or lower end of said buckets striking the said braces and spilling the contents and injuring plaintiff." And it is charged that defendant knew, or by the exercise of ordinary care would have known, thereof.

The answer, after the court had sustained a motion directed to a part thereof, and as it stood when the cause went to trial, was a general denial.

The evidence shows that at the time of plaintiff's injury one Fred Fisher was acting as defendant's signal man on the carriage above mentioned. Just how long he had been performing such duties is a question as to which the evidence is conflicting. On behalf of plaintiff there was testimony of witnesses working in and about the sewer to the effect that Fisher had acted as signal man for a period of only two or three days prior to plaintiff's injury. One Harbison had been defendant's regular signal man, and Fisher had been employed as a common laborer digging and working in the trench. It appears, however, that Harbison gave Fisher some instructions as to giving the signals, and that for at least some short time prior to the occasion in question the latter had been acting in this capacity. Defendant's testimony went to show that Fisher had first given signals something like three months prior to the time of the accident; that he had relieved Harbison from time to time, in the meantime, and that in all he had acted in this capacity for a period amounting to perhaps fifteen days. But that, as has been said, was a matter in dispute; for the testimony of witnesses for plaintiff, who were present during the period in question, was to the effect that Fisher had only begun to give signals two or three days before the date upon which plaintiff was injured.

On behalf of plaintiff there was considerable testimony to the effect that so long as Harbison, the regular signal man, was giving the signals, the buckets were raised and held to such a height that the bottoms thereof would be from four to six inches above the crossbeams above mentioned, as they were being conveyed down the elevated track; but that during all of the time that Fisher acted as signal man, the buckets were stopped at such a height that there was but a very small space between them and the crossbeams, as they moved along the track; that they were frequently operated but half an inch, an inch, or two

inches above the crossbeams, though sometimes the distance was three or four inches; and that the buckets actually touched and scraped the beams a number of times.

It was shown that, during the time while Fisher was acting as signal man, defendant's foreman was on the ground supervising and directing the work, and in a position to see and know what the signal man was doing and how the buckets were being elevated and conveyed.

And it was shown that at the time of plaintiff's injury defendant was excavating rock from the trench ahead of where plaintiff was working, and conveying the same in these buckets above plaintiff. And there was testimony to the effect that as two of the buckets were being hoisted Fisher prematurely signalled the engineer to convey the carriage and buckets down the track, at a time when one of the buckets was hanging so low that it struck a crossbeam of the track above plaintiff, causing the bucket to swing and the rock to fall therefrom upon plaintiff and injure him.

I.   Appellant urged that its demurrer to the evidence should have been sustained. But we think that the demurrer was well ruled. It is true that in order to cast liability upon the master for the act of a fellow servant of the plaintiff, upon the ground of the incompetency or habitual negligence of such fellow servant, the general rule is that it must appear that the latter was habitually incompetent or negligent, and that such habitual incompetency or negligence of the servant was known to the defendant, or by the exercise of ordinary care could have been known to him; and that the master after having such actual or constructive knowledge thereof retained the incompetent or negligent servant in his employ. [See Allen v. Lumber Co., 171 Mo. App. 492; Tucker v. Telephone Co., 132 Mo. App. 418, 112 S. W. 6.] Though it has been

held that "whether one act of negligence will establish incompetency, or not, depends upon the character of the act;" that an act "may be such as, *per se,* to prove incompetency." [See McDermott v. Ry. Co., 87 Mo. l. c. 295.] But we think that there was ample evidence tending to establish a state of facts which, if true, brings plaintiff's case within the general doctrine above stated.

It quite clearly appears that Fisher, who was acting as signal man at the time of plaintiff's injury, had previously been performing the work of an ordinary laborer in the trench, and that the defendant had taken him from this work and placed him in charge of the operation of its sewer machine, as signal man. The testimony is conflicting as to how long he had been performing the latter services before plaintiff's injury. Be this as it may, the testimony of plaintiff's witnesses is to the effect that during *all* of the time that Fisher was acting in this capacity the buckets were not elevated to the height which they had been during the time that Harbison, the regular signal man, was in charge of the machine, but that during all such period it was customary for Fisher to so give his signals that the buckets, as they were conveyed by the carriage down the track, would ordinarily clear the crossbeams by a very narrow margin—frequently by as little as half an inch, one, two or three inches; and that during this time, the buckets were seen to actually touch or scrape such crossbeams quite a number of times, and which may be readily inferred to have been due to the manner of giving the signal.

During all of this time the defendant had a foreman at the place in charge of the work; and obviously what others saw respecting the habitual operation of the machine he could and should have seen and known. Under such circumstances as appear here in evidence, ordinary care on the part of the master, or his representative, would require that such matters be observed.

Undoubtedly the work was one fraught with much danger to those working in the trench below, over whose heads the machine was being operated, and especially when rock was being excavated and conveyed in swinging buckets which might be tipped and their contents precipitated below.

From the evidence it appears that the height to which the buckets were raised prior to being started upon their way down the track depended much upon the time of signalling the engineer and the operation of the lever designed to cause the buckets to be held in position by the ratchets. And it further appears that the work of the signal man was not such a simple task as appellant would have us believe; but one which required a certain amount of skill and experience in order to safely operate the mechanism in question, under the circumstances appearing. It seems that the buckets and the carriage were operated with considerable rapidity; that the buckets were raised rather rapidly until the engineer was signalled as they neared the point where they were to be held suspended; and that when they were there caught and held in position, the carriage would begin to move on its way. Indeed it appears that frequently there was no stop or interval between these two movements, although it seems that the proper and safe plan of operation was to see that the buckets were securely fastened in position before moving the carriage. At any rate the entire operation was a rapid one; and it is said that the carriage moved along the track at or about the speed that a horse would trot.

In view of all of the facts appearing in evidence as to the nature of the work, the duties of the signal man, the danger involved, and the evidence adduced touching the manner in which Fisher performed the duties of such position during the time that he was employed in that capacity, it cannot be doubted that there was substantial evidence tending to show that

the latter was not sufficiently competent and qualified—did not possess the requisite skill—for the performance of such duties; and that the master either knew this, or at least had ample opportunity, by the exercise of ordinary care, to have discovered and known the same, as was its duty to do. Indeed plaintiff's evidence tends with much force to show that defendant's said servant, who it seems was but an ordinary laborer was totally unfit to be entrusted with duties upon the proper performance of which depended the lives and safety of men working directly below in the trench, without protection from falling objects, and that defendant knew or should have known thereof.

We think that the plaintiff made a sufficient showing upon this assignment of negligence alone to take his case to the jury, and therefore, so far as concerns the ruling on the demurrer to the evidence, it is unnecessary to consider the other charges of negligence upon which the case was tried; but these will be touched upon in considering the assignments of error made by appellant with respect to the instructions.

II. Error is assigned with respect to the giving of instruction No. 1 for plaintiff, which told the jury that if they found that defendant negligently employed and retained in its employ at said time and place an incompetent and unskilled signal man, who was not reasonably fit and competent to perform such duties, and that because of such incompetency and unfitness, if any, he caused the carriage to be started and moved along the track while one of the buckets was hanging so low that it struck a certain crossbeam, and which was thereby caused to tip and spill out a heavy rock, etc., whereby plaintiff was injured; and that defendant knew, or by the exercise of ordinary care would have known, of the unfitness and incompetency of said signal man and of the danger to plaintiff by reason

thereof, etc., then the verdict should be for the plaintiff.

That there was evidence to support this instruction follows from what we have said above. It is assailed, however, upon the ground that the jury are not thereby required to find that the signal man actually gave a signal to the engineer to start the carriage when the buckets had not been raised to the proper height. There is no merit in this, however, for the reason that the instruction requires the jury to find that, because of Fisher's incompetency and unfitness, he caused the carriage upon this occasion to be started and moved along the track, when one of the buckets was hanging so low that it struck a certain crossbeam.

The instruction is further said to inhere with error because it assumes that the signal man was incompetent. But a reading of the instruction makes it perfectly clear that it is not open to such criticism; for it very plainly requires the jury to find that the signal man was unskilled, and not reasonably fit and competent to perform such duties, and that defendant negligently employed and retained him. The instruction nowhere assumes that the signal man was incompetent.

It is also said that there was no evidence upon which to base a finding that the defendant knew or by the exercise of ordinary care would have known of the incompetency of the signal man. This, however, is fully disposed of by what we have said above; and further comment is unnecessary.

III. Error is further assigned in the giving of plaintiff's instruction No. 2, which told the jury that if they found that defendant at said place then used and operated a certain carriage upon a track extending along the top of the sewer, "and that large buckets, by means of cables and steam power, were being lowered into the sewer and after being filled were hoisted up to the track and were being conveyed along

said track and over and above where plaintiff was standing and required to stand," and that the buckets, *"while so customarily operated, were hanging so low that they came in contact at their lower end with and against a certain wooden crossbeam or beams,* and that one of the said buckets was thereby tipped, tilted and caused to spill and drop a large rock which struck plaintiff on the back part of his head;" and that the defendant "adopted and used at said time and place, in conveying the said buckets along said track over plaintiff, as aforesaid, *a plan which was not reasonably safe in this, that said buckets were likely to tilt and swing and to strike the said crossbeam and to spill the said rock and injure plaintiff,"* and that defendant knew, or by the exercise of ordinary care should have known, that the said plan was not reasonably safe, etc., and that such negligence, if any, directly caused one of the buckets to strike a crossbeam and tilt, and to spill the rock and injure plaintiff, then plaintiff was entitled to recover. (The italics are ours.)

It is urged that the giving of this instruction was error because there was no testimony upon which to predicate it. Appellant's argument in this regard proceeds upon the theory that the portion of the instruction first above italicized requires the jury to find that the customary or normal way of handling the carriage and buckets, adopted by defendant, was to move the carriage when the buckets were so low that they came in contact with the crossbeams. And it is argued that plaintiff's own evidence is that the buckets were customarily operated (i. e., while Harbison was signal man and before Fisher began to perform such duties), at such a height that they would clear the crossbeams by a space of from four to six inches; and that there was no evidence that the customary or normal operation of the buckets was such as to cause them to strike the crossbeams, but that on the contrary all of the tes-

timony was to the effect that under Harbison this had never been known to happen.

We think, however, that the instruction is not to be given the meaning which appellant seeks to ascribe to it with respect to the use of the words "while so customarily operated." These words, as used in the first italicized portion of the instruction above, do not appear to have been intended to be construed with the language immediately following them, in the way that appellant construes them.

The instruction requires the jury to find that at the time and place when and where plaintiff was injured the defendant used and operated a certain carriage along a track, and that buckets were lowered into the sewer by means of cables, and which, when filled, were hoisted and conveyed along the track above plaintiff, etc., and that such buckets "while so customarily operated" were hanging so low that they came in contact with a certain crossbeam, or beams, and that one of said buckets was thereby tipped, etc. It does not seem that the jury would understand from this that they were required to find that defendant's custom, in the usual and normal operation of the machinery, was to operate the same with the buckets so low that they struck the crossbeams. The instruction does not require the jury to find that *defendant customarily operated* the buckets thus; nor that *as defendant customarily operated* them they were hanging so low that they came in contact with the beams. The wording of the instruction is somewhat unfortunate, but it appears first to deal with the general method employed in performing the digging operations by hoisting and conveying the buckets in the manner mentioned, and the jury are then required to find that the buckets *"while* so customarily operated," (i. e., according to defendant's general plan and method previously described) were, on this particular occasion, hanging so low as to come in contact with a beam or beams "and that one

of said buckets was thereby tipped,'' etc. In other words it appears that the jury were required to find that the buckets were on this occasion hanging so low that they came in contact with the beams; not that it was defendant's custom to normally operate them in this manner; and that the words ''while so customarily operated'' refer to the general method of handling the buckets, previously mentioned.

This appears to be further borne out by the succeeding portion of the instruction which we have above italicized, by which the jury were authorized to find that the general plan and method adopted by defendant was not reasonably safe, in that the buckets, as operated, were likley to tilt and swing and to strike the crossbeams. The latter appears to be the gist of the instruction, and which is predicated upon plaintiff's second assignment of negligence above mentioned, contained in his petition, and which charged that defendant's method or plan of operation was not reasonably safe.

And while the instruction is not drawn with great nicety or technical accuracy, nevertheless we think that the jury could not well have been misled by it into the belief that they were required to find that the defendant normally operated the buckets so low that they struck the crossbeams.

And we think that there was sufficient evidence upon which to predicate a finding that the general plan adopted by defendant, with which this instruction really deals, was not a reasonably safe one. There was testimony that, as the machine was then arranged and operated, the greatest possible clearance between the buckets and the crossbeams was about a foot or possibly fourteen inches; that even under the regular signal man the buckets were ordinarily stopped at a height of only from four to six inches above the crossbeams; that while the buckets were ascending rather

rapidly it was necessary for the signal man to cause them to be stopped and caught by the ratchet arrangement before they ascended high enough to forcibly strike or interfere with the machinery above, and when they were sufficiently high to clear the crossbeams; that the ratchet arrangement was such that if one of the so-called dogs missed a tooth on the ratchet wheel a bucket would drop back about eight inches. This testimony, together with the fact that the buckets were swinging suspended by cables attached to the bails thereof, and that the entire operation was a rapid one, tended to show that the method of operation was such that danger inhered therein with respect to the buckets striking the crossbeams and tilting; and there was evidence from which the jury might find that the defendant, upon the whole, had not adopted a plan of operation that was reasonably safe, at any rate when large rocks were being thus conveyed over the heads of unprotected workmen.

And what we have said above disposes of the contention that this instruction is inconsistent and in conflict with instruction No. 1 above discussed. Viewing instruction No. 2 as we do, the two theories of negligence are not inconsistent. Both were pleaded and were not without proof justifying their submission to the jury.

IV. A further assignment of error pertains to the giving of instruction No. 3 for plaintiff. This instruction, aside from the preliminary portion thereof, told the jury, in substance, that if the latter found that the conveying machine which defendant was using at the time and place in question was negligently constructed, arranged and used, in that the space between the bottoms of the buckets and the crossbeams was so small that there was immediate danger, in operating the buckets, of the lower ends thereof striking the crossbeams and spilling their contents; and that defendant

knew or by the exercise of ordinary care should have known thereof and that it was dangerous to plaintiff, while engaged in his work, for the buckets to be so operated and that the buckets were apt to swing, tilt and strike the crossbeams and injure plaintiff; and that such negligence of defendant, if any, directly caused one of the buckets to strike a crossbeam and tilt and to spill the rock and injure plaintiff, then their verdict should be for plaintiff.

It is said that there was no evidence upon which to predicate this instruction, for the reason that the testimony of witnesses for plaintiff and defendant alike was to the effect that the conveying machine used by defendant was a "Potter Sewer Machine," of standard type, and such as was generally in use in sewer work at the time in the city of St. Louis.

And in this connection appellant relies greatly upon Brands v. St. Louis Car Company, 213 Mo. 698, 112 S. W. 511, where, among other things, it is said: "No inference of negligence can arise from evidence which shows that the implement was such as is ordinarily used for like purposes by persons engaged in the same kind of business." . . .

That was a case involving the liability of a master for injuries sustained by the servant caused by the bursting of an emery wheel. And the negligence upon which the case was grounded was that defendant did not use a certain convex wheel instead of the straight one which burst. [See, also, Chrismer v. Telephone Co., 194 Mo. l. c. 208, 209, 92 S. W. 378; Coin v. Lounge Co., 222 Mo. l. c. 506, 121 S. W. 1; Jewell v. Bolt & Nut Co., 231 Mo. 176, 132 S. W. 703; O'Dowd v. R. R. Co., 166 Mo. App. l. c. 669, 150 S. W. 729.]

But obviously this doctrine is wholly without influence here. This is for the reason that the testimony upon which appellant relies in this regard goes not further than to show that the sewer machine was one of standard type, generally in use.    This instruction,

which is predicated upon the third assignment of negligence, mentioned above, and pleaded in the petition, proceeds not upon the theory that defendant was negligent in using a sewer machine of this type or sort, but upon the theory that the machinery, comprising the same was negligently arranged and placed, in that, as the parts were then correlated and operated, the space between the bottoms of the buckets and the cross-beams was too small for the safe operation thereof. The theory of negligence thus submitted does not differ materially from that submitted by instruction No. 2, but deals more particularly with the arrangement of the parts of the device, as it was then being operated.

There was evidence tending to show that the mechanism employed could be so arranged that the buckets could be raised to a greater height than that permitted by defendant's arrangement thereof. And in this regard it was not shown that it was usual or customary to operate such mechanism as defendant did operate it, under like circumstances and conditions.

Without repeating what we said above respecting the giving of instruction No. 2, we think it clear that there was sufficient evidence to justify the giving of the instruction now under consideration. There was sufficient evidence from which the jury might find that defendant had breached its duty to the servant, under the theory of negligence submitted by this instruction, and that such operated to cause plaintiff's injury.

V. Further assignments of error are disposed of by what has been said above, and need not be separately noticed. A careful examination of the record has convinced us that no error prejudicial to the appellant intervened below. No point is made respecting the amount of plaintiff's recovery. The judgment should therefore be affirmed. It is so ordered. Nortoni, J., concurs. Reynolds, P. J., dissents, being of the opinion that the demurrer to the evidence should have been sustained.